Lucinda BOUSQUET, Appellant,

v.

William BOUSQUET, Appellee.

No. S–1053.

Supreme Court of Alaska.

Jan. 23, 1987.

Rehearing Denied Feb. 27, 1987.

Lucinda Bousquet, pro se.

Stuart A. Ollanik, Gilmore and Feldman, Anchorage, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

This divorce appeal raises numerous specifications of error regarding the superior court's property division.

## I. FACTS.

Lucinda and William Bousquet were married in Des Moines, Iowa, in September of 1978. In 1981, they moved to Alaska. In addition to their respective regular employments, the Bousquets began painting houses part-time. By January 1982, this sideline had become an actual business known as Phantom Enterprises. William worked full-time for the business once it got underway and did all the painting. Lucinda continued her regular job as a real estate agent and contributed to Phantom Enterprises during evenings and weekends.

The parties separated in October 1982. In May 1983, the superior court issued a partial judgment and decree of divorce. Property division issues were referred to a master. The superior court subsequently entered an order adopting the master's report and final decree.[1] Lucinda then brought this appeal.

## II. DID THE SUPERIOR COURT ERR IN FAILING TO DIVIDE PHANTOM ENTERPRISES ACCORDING TO PRINCIPLES OF PARTNERSHIP LAW?

██ Lucinda argues on appeal that Phantom Enterprises was a partnership

1. The master's report concluded that the following property was subject to division:

A. Real Property

| | |
|---|---|
| Crow Circle House | $29,645.00 |
| Earnest money agreements on 4 Lots | $ 4,000.00 |

B. Personal Property

| | |
|---|---|
| Cash | $45,251.00 |
| Phantom Enterprises (assets and liabilities) | $ 8,000.00 |
| Lincoln House Payoff | $ 2,500.00 |
| Gold and Silver (in C. Bousquet's possession) | $ 6,400.00 |
| Gold and Silver (in B. Bousquet's possession) | $ 2,000.00 |
| Tools | $ 1,000 |
| Miscellaneous Personal Property | |
| Stained glass windows | –0– |
| Shower Door | –0– |
| Shop Vaccuum [sic] | –0– |
| Butcher Block | –0– |
| Knife Set | –0– |
| Personal Property in C. Bousquet's Possession | –0– |
| Personal Property in B. Bousquet's Possession | –0– |

C. Debts

| | |
|---|---|
| C. Bousquet's Father | $ 4,000.00 |
| B. Bousquet's Father | $ 3,000.00 |
| Accountant | $ 1,000.00 |
| Mary Pierce | $ 877.30 |

D. Offsets, Credited to B. Bousquet

| | |
|---|---|
| Airplane Tickets (½ of $1,400.00) | $ 700.00 |
| Traveler's Checks (½ of $1,800.00) | $ 900.00 |
| Phantom Enterprises Business Checks (½ of $14,390.00) | $ 7,195.00 |
| Reimbursement for painting | $ 3,300.00 |
| Lincoln House Payments (½ of $1,645.00) | $ 822.50 |
| Loan to C. Bousquet | $ 1,000.00 |
| Cost of Business Appraisal (½ of $1,000.00) | $ 500.00 |
| Total | $14,417.50 |

The report settled on the following as "a fair and equitable division of the marital property and debts":

A. To Lucinda Bousquet

| | Value |
|---|---|
| Crow Circle House | $29,645.00 |
| Interest in 4 Lots | $ 4,000.00 |
| Lincoln House Payoff | $ 2,500.00 |
| Gold & Silver in her possession | $ 6,400.00 |
| Personal Property in her possession | –0– |
| Butcher Block | –0– |
| Knife Set | –0– |
| Total | $42,545.00 |

B. To William Bousquet

| | |
|---|---|
| Phantom Enterprises | $ 8,000.00 |
| Tools | $ 1,000.00 |
| Gold & Silver in his possession at separation | $ 2,000.00 |
| Personal Property in his possession | –0– |
| Stained Glass Windows | –0– |
| Shower Door | –0– |
| Shop Vaccuum [sic] | –0– |

and therefore should have been divided according to the requirements of the Uniform Partnership Act.[2] She contends that she is an expelled partner under AS 32.05.360(f) and thus has the rights available to a retiring partner under AS 32.05.370. Lucinda further contends that she "has the right to demand an accounting of the business and then her choice of either her interest in the business plus interest from the time of dissolution or to share in the portion of the profits of the business until such time as the partnership is terminated."

William responds that Lucinda argued to the trial court that Phantom Enterprises should be valued and treated as marital property subject to division. The superior court did treat the business as a marital asset, although not of the value that Lucinda had advocated. William contends that since Lucinda requested the trial court to value and divide the business as marital property, she should not now be permitted to argue that the court lacked authority to divide the property and that she be treated as a former partner for purposes of determining her share of the business. William further points out that Lucinda has never sought partnership treatment of the business, made no mention of the partnership statute to the master, and at no time instituted any action based on the partnership statute.

We find William's arguments persuasive. The superior court was requested to value and divide Phantom Enterprises as marital property, and it did so. We thus conclude that it did not err in failing to divide the parties' business in accordance with partnership law.[3]

## III. DID THE SUPERIOR COURT ERR IN ITS VALUATION OF PHANTOM ENTERPRISES?

Lucinda raises numerous specifications of error regarding the superior court's valuation of Phantom Enterprises. William submitted an appraisal from Dahe Good, an appraiser for Alaska Valuation Service, which valued Phantom Enterprises at $8,000 as of August 1983. Lucinda contended that the business' net profits were much higher than the appraisal indicated and requested that the business be valued at $80,000. The superior court accepted William's appraisal and valued Phantom Enterprises at $8,000.

We will disturb the court's valuation of marital property only if it is clearly unjust. *Hunt v. Hunt*, 698 P.2d 1168, 1170 (Alaska 1985); *Merrill v. Merrill*, 368 P.2d 546, 547 (Alaska 1962).

### A. *Calculation of Income and Expenses.*

The appraiser's report indicated that from April 1, 1982, to December 31, 1982, gross sales for Phantom Enterprises totalled $177,297, and the cost of goods sold totalled $127,228. The report further indicated that from December 1, 1983 to July 31, 1983, gross sales were $153,559, and the cost of goods sold was $101,077.[4]

Lucinda contends that a new appraisal is necessary because the appraiser's calculations of income and expenses are inaccu-

| B. To William Bousquet—Continued | | Value |
|---|---|---|
| Savings Account | | $44,251.00 |
| | | $55,251.00 |
| Less Offset Amount | | $14,417.50 |
| | Total | $40,833.50 |

| C. Debts | | |
|---|---|---|
| To Lucinda Bousquet | | |
| Her father | | $ 4,000.00 |
| Mary Pierce (½) | | $ 438.65 |
| | | $ 4,438.65 |
| To William Bousquet | | |
| His father | | $ 3,000.00 |
| Accountant | | $ 1,000.00 |
| Mary Pierce (½) | | $ 438.65 |
| | | $ 4,438.65 |

**2.** AS 32.05.010–.430.

**3.** By this holding we do not mean to imply that Phantom Enterprises did not in fact constitute a partnership, but merely that Lucinda's failure to raise partnership issues at trial precludes her from doing so on appeal.

**4.** The appraiser indicated that this information was derived from a summary of the business' 1982 tax return which was prepared by a certified public accountant, a copy of the itemized check register for the business from January through July 1983, a summary and a listing of assets and accounts prepared by an accountant, as well as copies of job contracts.

rate and consequently the appraisal of the business' fair market value is also inaccurate. Lucinda contends, based on her own analysis, that cash sales from November 1, 1982, to May 30, 1983, totalled $220,547, and "real" business expenses totalled $106,377.08, leaving a net profit of $122,-169.20.[5]

The master concluded in part that "[n]either Cindy Bousquet's testimony nor her analysis were reliable enough to justify disregarding the appraisal of the business." Given the appraiser's qualifications and the problems with Lucinda's analysis, we cannot conclude that the master's acceptance of the appraisal was error.[6]

### B. *Salary and Rent.*

In determining the fair market value of Phantom Enterprises, the appraiser factored in "economic rent" of $2,340 and "economic salary for the owner/operator" of the business of $40,000. Because it was necessary to place values on rent and salary in order to arrive at an accurate appraisal of the business, the inclusion of these items in the appraisal was not error.

In light of the foregoing, we conclude that the superior court's valuation of Phantom Enterprises was not clearly unjust.[7]

### IV. THE EXISTENCE, AVAILABILITY FOR DISTRIBUTION, AND VALUE OF THE OTHER ASSETS.

### A. *Corvette.*

■ Lucinda argues that the superior court's exclusion of the value of William's Corvette from the marital estate constitutes error. William testified that he purchased a Corvette in April or May of 1983

for $10,000 and subsequently sold it for the same amount. Lucinda contends that the money from the sale should have become part of the marital estate. William answers that Lucinda presented no evidence of existing marital assets that were not divided.

We agree with William. Absent evidence that the marital estate was invaded, we hold that the superior court was correct in excluding the value of the Corvette from the marital estate.

### B. *Gold and Silver.*

The parties acknowledged that each had approximately $2,000 in gold and silver at the time they separated in October of 1982. William testified that he purchased an additional $8,000 in gold and silver and later sold all the gold and silver in his possession. The superior court credited each party with the $2,000 in gold and silver which each had at separation. Lucinda argues that the superior court erred in failing to include the additional $8,000 in gold and silver among William's assets.

We see no error in the superior court's ruling in light of the absence of any evidence suggesting that William's additional purchases of $8,000 in gold and silver were made with funds improperly obtained from marital properties.[8]

### C. *$2,000 Earnest Money.*

Lucinda argues that the superior court should have included in the marital estate a $2,000 earnest money deposit which she claims William made in order to purchase a parcel of real property during the mar-

---

**5.** Lucinda also submitted to the superior court a copy of Phantom Enterprises' 1982 income tax return, which indicated gross sales of $312,297 and cost of goods sold of $256,363.

**6.** As noted at the outset, the superior court adopted the master's report.

**7.** We have reviewed Lucinda's other specifications of error regarding the appraisal of Phantom Enterprises and have concluded that none has merit. These contentions are that the appraiser erred in not treating Phantom Enterpris-

es as a partnership; that the appraiser erred in stating that the business was not operated full time until August 1982; and that the appraiser ignored the contributions of each party to the partnership.

**8.** The superior court credited Lucinda with an additional $4,400 representing gold and silver which she purchased subsequent to separation. She purchased this gold and silver with funds from a $10,000 certificate of deposit that the parties had agreed was marital property.

riage. The record contains no evidence to sustain Lucinda's contention, and we therefore find no error on the part of the superior court.

### D. $2,000 Personal Property.

The superior court attributed zero value to certain items of unappraised personal property, and then divided this property between William and Lucinda. Lucinda argues that the court should have attributed $2,000 in personal property to William. We see no basis for concluding that the superior court erred in the division it made.

### E. Insurance Loan.

■ To support her objections to the master's report, Lucinda offered evidence not previously submitted to the master that she and William had borrowed $2,753.85 against a life insurance policy which Lucinda had procured prior to the marriage.[9] Lucinda cancelled the policy and received a $501 refund. She argues here that the superior court should have incorporated the remaining debt of approximately $2,250 into the marital estate. Since Lucinda demonstrated no reason for her failure to bring this evidence before the master, we hold that the superior court did not abuse its discretion in disregarding it.

### F. $1,000 Loan to William.

■ Lucinda contends that the superior court should have credited her with $1,000 that she loaned to William in April 1983. The only testimony regarding this subject is located in the context of Lucinda's description of the circumstances surrounding William's purchase of the Corvette.

As best I know, Bill came to me about this the first week in April, when he was fixing the blinds for me to borrow $1,000, and one week later, I found out he had bought a Corvette, and I did see it.

This evidence does not provide a sufficient basis for us to conclude that the superior court erred in failing to recognize the purported $1,000 loan in dividing the marital property.[10]

### G. $3,300 Credited to William for Painting the Sturbridge House.

■ The superior court adopted the following finding of the master:

The parties built and sold a house located on Sturbridge Circle in Anchorage. At the time of the sale Cindy Bousquet took a sales commission of approximately $2,000 out of the proceeds. Bill Bousquet testified he had expected to be paid $3,300 for his painting work and never received it. Since Cindy Bousquet was compensated for her individual effort, it appears equitable for Bill Bousquet to receive the same treatment.

Lucinda makes a number of contentions regarding this finding. She first argues that since the profit from the sale was placed in the joint bank account ultimately awarded to William, he would receive double payment if credited for the painting work. William correctly points out that the master treated the profit from the business as marital property and did not award the bank account to William in excess of the value of Lucinda's share of the parties' marital assets.

Lucinda further argues that since the Sturbridge house was built and painted by Phantom Enterprises before the parties' separation, William was not entitled to remuneration for his work for the business. Lucinda additionally contends that her efforts as a realtor were totally separate from her activities on behalf of Phantom Enterprises. This latter contention is incorrect since the house was sold by Phantom Enterprises and Lucinda took her sales commission out of the proceeds. While

---

**9.** The evidence consisted of a photocopy of a statement of the policy's cash surrender value from the insurance company.

**10.** As was the case with respect to the insurance loan previously discussed, Lucinda offered evidence to support her contention (a cancelled

check for $1,000 made payable to William from the parties' joint account) that was not previously submitted to the master. Again, she fails to explain her failure to bring this evidence to the master's attention, and this evidence therefore does not bear on our disposition of this issue.

Lucinda may have had a separate occupation as a realtor, her actions as a realtor in this instance were equivalent to actions of a partner in furtherance of the partnership. William's painting work represented a comparable contribution of effort to the business, and we therefore hold that the superior court did not err in giving William credit for that effort.[11]

### H. Preservation of Assets

■ The superior court credited William with one-half of the $1,645 in payments which he testified to making to cover the shortfall on one of the couple's houses in Iowa before it was sold.

Lucinda argues that she contributed approximately $900 in payments to cover the shortfall on the Iowa home. She also testified that she had spent approximately $600 or $700 on repairs on the Sturbridge house after the parties' separation. She argues that since the superior court reimbursed William for his expenses to upkeep the marital property, she should likewise be reimbursed. William makes no counter-argument on this issue.

Our review of the record persuades us that the superior court did err in failing to credit Lucinda with half of the approximately $1,500 in expenses she incurred in upkeep of the parties' marital property.

### I. $14,390 in Business Checks.

■ When the parties separated in October 1982, Lucinda had possession of $17,390 in Phantom Enterprises business checks. She testified that she cashed these checks, sent $1,500 to her father in repayment of a loan he made to the couple, and

deposited approximately $7,300 (the superior court attributed $7,890, in accordance with her affidavit) in her personal savings account. Lucinda also testified that she placed $8,000 into the parties' joint business account, and subsequently withdrew $5,500. The superior court concluded that Lucinda had kept $14,390 out of the original $17,390, and reimbursed William for one-half of that amount ($7,195).

Lucinda argues that if William received credit for the business checks she used that she should have received credit for $12,900 Phantom Enterprises checks which William acknowledged using. She contends that these checks were income from the business earned prior to separation and that the money was "equally divided" by the parties upon separation.

William points out that while he used business checks in order to meet expenses for Phantom Enterprises, which he continued to operate after the parties separated, Lucinda used the $14,390 in business checks for her own personal purposes.

We hold that the superior court erred in crediting William with $7,195. Here it is of significance that the date of the valuation of Phantom Enterprises accepted by the court was August 1983. Thus, the value of the business was not fixed as of the time of the parties' separation in October 1982. Also worthy of mention is the fact that Lucinda did not violate the superior court's preliminary injunction which restrained the parties from disposing of marital assets by her use of those Phantom Enterprises checks. Lucinda set forth a detailed account of the uses she had made of the checks in question in an affidavit executed

---

11. The general rule is that *"[i]n the absence of an agreement to provide for such compensation,* remuneration for a partner's services performed in the course of partnership affairs is prohibited by statute." *Schymanski v. Conventz,* 674 P.2d 281, 284–85 (Alaska 1983) (emphasis added).

At trial the following exchange occurred between William and his attorney regarding the former's compensation for his work.

Q. Was there any agreement between you and Cindy as to whether you would receive any compensation for your effort as a sort of subcontractor for the house?

A. Yeah, I thought I'd get paid for it.

The superior court could thus find that there existed between the parties an agreement to compensate William. Assuming *arguendo* that Phantom Enterprises was a bona fide partnership, such a finding would permit compensation of William for personal services he performed in the course of partnership affairs, despite his status as a partner. Accordingly, it would also support the result we reach here.

on December 7, 1982,[12] and the court's injunction was not entered until December 16, 1982. Given the foregoing, we hold that Lucinda's uses of the $14,390 should be viewed as the equivalent of proper partnership draws.[13]

### J. *$1,500 Debt to Lucinda's Father.*

Lucinda used $1,500 from the Phantom Enterprises business checks to partially repay a loan which her father had made to herself and William. In balancing the parties' respective debts, the superior court assessed Lucinda with a debt of $4,000 to her father.

Lucinda argues that she should receive credit for half of the $1,500 that she paid on a $5,500 marital debt. William's counterrargument is that the superior court did not credit Lucinda with this amount because it treated the couple's debt to her father as being $4,000, not $5,500. If this is true, then given that the court required Lucinda to pay the full $4,000 debt and assessed against William an equal amount owed to other creditors, Lucinda effectively did receive credit for the $1,500 payment; her actual remaining debt to her father would be $2,500 ($4,000—$1,500), not $4,000.

William argues that the court's conclusion that $4,000 represented the debt prior to application of the $1,500 payment was not clearly erroneous because the testimony regarding the total amount of the debt was "ambiguous". However, the only testimony on this point was that Lucinda had paid her father $1,500 for a car he had given her, and that $4,000 represented the remainder of the debt. William testified only that Lucinda had "paid her dad some money" but did not remember the amount involved. On this basis we conclude that the superior court erred in failing to credit Lucinda with $750.[14]

12. Confirming her testimony, Lucinda stated in her affidavit that she deposited $8,000 into the business account on October 25, 1982; that she sent $1,500 to her father as partial payment of his loan of $5,500 to the couple; and that she deposited $7,890 in a savings account. On November 1, 1982, she withdrew $5,500 from the business account to pay bills.

13. At the hearing which was held in regard to the preliminary injunction, Lucinda's counsel stated, "we would like that both parties be restrained and enjoined from disposing of any assets, marital assets or business assets, in this marriage, except where it's necessary to continue the business or to live on, it should be accounted for."

14. None of Lucinda's remaining specifications of error have merit.

Lucinda argues that the superior court abused its discretion in failing to consider each person's financial condition in making the final distribution. In rebuttal William points out that Lucinda requested an equal division of the marital estate and that she be awarded the interest in the marital home; both requests were granted. Moreover, there is a presumption that the most equitable division of the property is an equal division. *Wanberg v. Wanberg,* 664 P.2d 568, 574–75 (Alaska 1983).

Lucinda has not shown that the superior court erred in listing the appraisal fee as $1,000. The appraiser testified that the bill for the appraisal alone was $700, and William estimated that he paid a total of $900 for the appraisal and court time.

Lucinda has not shown that it was erroneous for the superior court to accept William's assessment of the equity in the Crow Circle home.

Lucinda also argues that the fact that William acquired a $248,000 home encumbered by a mortgage of only $135,000 and a $315,000 fourplex encumbered by a mortgage of $289,000 indicates that he possessed assets not disclosed to the superior court, an inference which should have subjected his credibility to question. William correctly notes that there was no evidence of any hidden assets that should have been divided as marital property and that assets acquired subsequent to separation are not considered marital property absent evidence that the spouse used marital property to obtain them. *See Schanck v. Schanck,* 717 P.2d 1, 3 (Alaska 1986).

Lucinda also contends that the superior court ignored evidence (which was not presented at trial) of IRS tax liens on the home ultimately awarded to her. She argues that this could have affected the property division because William received the couple's cash assets. William responds that he presented evidence of having satisfied the tax lien, and that the joint bank account awarded to him had also been subject to the lien. We find no reversible error on the part of the superior court.

Lastly, we are of the view that Lucinda has no grounds to complain that the case was too complex for the master to hear.

Accordingly, the judgment of the superior court is hereby AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings not inconsistent with this opinion.