Wendy G. BROWN, n/k/a Wendy
G. Audette, Appellant and
Cross–Appellee,

v.

Kevin M. BROWN, Appellee
and Cross–Appellant.

Nos. S–7340, S–7440.

Supreme Court of Alaska.

Oct. 31, 1997.

Gary Foster, Law Office of Gary Foster, Fairbanks, for Appellant and Cross–Appellee.

Fleur L. Roberts, Law Offices of Fleur L. Roberts, Fairbanks, for Appellee and Cross–Appellant.

Before COMPTON, C.J., and MATTHEWS, EASTAUGH, FABE and BRYNER, JJ.

## OPINION

MATTHEWS, Justice.

Each party in this matter appeals aspects of the trial court's second attempt at dividing property in a divorce proceeding. Regrettably, we conclude that a third attempt is necessary.

## I. BACKGROUND

Wendy and Kevin Brown married in 1980 and separated in 1990. They had two children during their marriage.

We have already decided some issues relating to the division of the parties'. property in this case. On July 6, 1994, we issued a memorandum opinion and judgment, *Brown v. Brown*, No. 0730 (*Brown I*). In that appeal, we considered the superior court's disposition of

> two parcels of raw land, one referred to as the Derby tract located in Fairbanks, and one located in Gig Harbor, Washington. Also in dispute is a series of cash transfers allegedly made as gifts to Wendy by her father, Vernon H. Boyles ... $250,000 in October 1988; $50,000 and $85,000 in May 1989; and $100,000 in July 1989.

We reversed in part, vacated in part, and remanded the case with the following instructions:

> The [superior] court shall hold a supplementary evidentiary hearing and make findings and conclusions concerning the marital or separate character of the Derby tract and the Gig Harbor property. The court should also address whether any or all of the monetary gifts were transmuted from separate to marital property prior to the dissolution of the marriage. Once these issues are decided the court should decide whether the marital property of the parties should be divided differently and whether the equities of the case require invasion of Wendy's separate property.

In response to our mandate, the superior court held additional proceedings and issued new factual and legal conclusions, which will be discussed below. Both Kevin and Wendy appeal.

## II. ANALYSIS TO BE APPLIED BY SUPERIOR COURT IN DIVIDING PROPERTY IN DIVORCE CASES AND THE APPLICABLE STANDARD OF REVIEW

Our decision in *Wanberg v. Wanberg*, 664 P.2d 568, 570 (Alaska 1983), requires a trial court dividing a couple's property to follow three steps.

Step one—determining what property is available for distribution—is reviewed under the abuse of discretion standard, although it may involve legal determinations to which this court applies its independent legal judgment. The second step—placing a value on the property—is a factual determination that will be upset only if there is clear error. Alaska R. Civ. P. 52(a). Step three—allocating the property equitably—

is reviewed purely under the abuse of discretion standard and "will not be disturbed unless it is clearly unjust."

*Lewis v. Lewis,* 785 P.2d 550, 552 (Alaska 1990) (citations omitted).

This appeal involves challenges to the trial court's decisions at "step one" and "step three."

## III. *DISCUSSION OF CHALLENGES TO THE SUPERIOR COURT'S "STEP ONE" ANALYSIS*

A. *In View of Kevin's Post–Trial Agreement with Wendy, the Superior Court Was Correct to Treat Trade Construction as Wendy's Separate Property.*

■ Trade Construction is a corporation of which Wendy is the sole shareholder. On this appeal Kevin argues that Trade Construction should be considered marital property.

Wendy represented at the original trial that, as a result of pending litigation against it, Trade Construction faced significant actual and potential liabilities.

At the conclusion of the original trial, the trial court ruled that Trade Construction was marital property. Accordingly, the trial court ruled that Kevin and Wendy were to share equally in Trade's assets and liabilities. Kevin wished to avoid exposure to Trade's potential liabilities. He therefore sought to convince the trial court to award him half of Trade's assets without requiring him to bear any of its liabilities. The trial court's response to Kevin's proposal was as follows:

And I'll say it for a third time on [t]he record, he can't have it both ways. If they're marital assets, the debts and the assets are marital assets.

. . . .

Well, if [Kevin] wants Trade to not be a marital asset, we can take care of that problem. We'll make Trade not a marital asset, but then he doesn't get any of the proceeds that came from Trade either.

In order to avoid any exposure for Trade's obligations, on November 1, 1991, Kevin made the following offer regarding Trade Construction:

I [Kevin's attorney] am willing to pass on to Kevin any offers of settlement concerning this issue of Trade Construction. Kevin would be willing to allow Wendy to have the $150,000 [in accounts owned by Trade Construction] without an accounting and in return, not be liable for the costs of litigation of the Mapco Counterclaim and potential liability for this counterclaim and also allow Wendy to retain the monies awarded to Trade Construction in this suit.

On November 25, 1991, Wendy replied to Kevin's offer as follows: ·

Kevin's offer to relinquish any rights in Trade Construction (past, present, and future) in exchange for being relieved of any liabilities (litigation costs or liability to Mapco) *is accepted.* Let me know if you think any additional paperwork, other than your letter offer and my acceptance above, is necessary.

Trade Construction prevailed in the litigation against it. At the remand hearing, Kevin argued that Trade Construction should be characterized as a marital asset. In response, the trial court noted the agreement regarding Trade Construction:

at the end of the trial I said Trade was a marital asset and that gave Kevin the liabilities as well as the assets. He chose, post-trial, to opt out of that and not have it be a marital asset for which he was responsibility—responsible for the liabilities. That's something that came after trial. It doesn't have anything to do really with [the remand issues] here.

■ Parties to a divorce may stipulate to the characterization of property.[1] "In general, the construction of stipulations is governed by the rules of contract" law. *Godfrey v. Hemenway,* 617 P.2d 3, 8 (Alaska 1980). "Absent a cognizable contract defense, such as fraud," stipulations should be enforced. *See Dewey v. Dewey,* 886 P.2d 623, 625–26 (Alaska 1994). On this appeal, Kevin appears to raise two points relating to the Trade Construction stipulation.

■ First, Kevin disputes the meaning of his agreement with Wendy. In particular, he

---

1. *See Laing v. Laing,* 741 P.2d 649, 652 (Alaska 1987) (noting without objection that "the parties in this case stipulated to the characterization of the divided assets as marital property").

seems to suggest that he did not agree that Trade Construction would be treated as Wendy's separate property. According to Kevin, he simply agreed "to allow Wendy to have the inventory, including the cash on hand and accounts receivable in exchange for being relieved from any of Trade Construction's debt." Although Kevin's argument is somewhat opaque, the implication seems to be that the superior court should have treated Trade Construction as marital property which was distributed to Wendy.

Kevin's proffered interpretation of his agreement with Wendy is untenable. As indicated by the portions of the record quoted above, Kevin wished to avoid responsibility for Trade Construction's obligations and liabilities, but the trial court was unwilling to permit him to do so unless he agreed that Trade Construction would be considered Wendy's separate property. Accordingly, Kevin stipulated that Trade Construction would be Wendy's separate property. Kevin's interpretation of the agreement—that, essentially without receiving any benefit in return, Wendy agreed to allow Kevin to avoid responsibility for Trade's potential liabilities—is unreasonable. Accordingly, we reject Kevin's argument.[2]

■ Kevin's second argument concerning Trade Construction is that he relinquished his claims to Trade Construction based on misrepresentations by Wendy. The trial court expressly refused to consider this argument at the remand hearing and suggested that Kevin raise the point in a separate motion. It appears, however, that Kevin failed to raise the point below as suggested by the trial court. Kevin therefore may not assert the point on appeal. *Tommy's Elbow Room, Inc. v. Kavorkian*, 754 P.2d 243, 245 n. 7 (Alaska 1988).

B. *The Trial Court Did Not Err in Concluding that the Gifts from Wendy's Father to Wendy Were Not Transmuted into Marital Property.*

■ We next consider Kevin's claim that the trial court erred in concluding that the

cash gifts from Wendy's father to Wendy had not been transmuted into marital property.

In *Brown I,* we stated:

Also in dispute is a series of cash transfers allegedly made as gifts to Wendy by her father.... Wendy claims that she received a total of $485,000 in cash gifts from her father.... Wendy used these monies for a series of loans and other transactions, with the proceeds eventually invested in a high-yield New Zealand money market account.

At the original trial, the superior court found that "Wendy had not demonstrated that these transfers were gifts to her alone" (i.e., that the transfers were properly regarded as marital property).

As mentioned above, we reversed the conclusion of the superior court on this point. We held that all of the cash transfers were Wendy's separate property at the time of transfer and remanded the case to the superior court with instructions to "address whether any or all of the monetary gifts were transmuted from separate to marital property prior to the dissolution of the marriage."

On remand, the superior court determined that all of the cash transfers are properly regarded as "separate property" because the transfers "were definitely not co-mingled. In fact, since Wendy never told Kevin about ... [the transfers] it is hard for the court to find any basis for Kevin's assertion of co-mingling."

We affirm the trial court's conclusion on this point. In essence, Kevin makes two arguments in support of his contention that the trial court erred in concluding that the cash transfers had not been transmuted into marital property. First, Kevin argues that the trial court's determination that the cash gifts were not transmuted into marital property should be reversed because, according to Kevin, the cash gifts were co-mingled with marital assets. This argument warrants only

---

2. *See Godfrey v. Hemenway*, 617 P.2d 3, 8 (Alaska 1980) (stating that "[t]he courts look with favor on stipulations designed to simplify, shorten or settle litigation, or to save costs and will not give such stipulations a forced construction").

brief discussion. Under Alaska law, the co-mingling of separate property with marital assets does not necessarily mean that separate property has been transmuted into marital property.[3] "Placing separate property in joint ownership is rebuttable evidence that the owner intended the property to be marital." *Chotiner v. Chotiner*, 829 P.2d 829, 833 (Alaska 1992). However, there was evidence sufficient to overcome this presumption and to support the trial court's decision that the transfers retained their character as separate property. Wendy's father made the gifts to Wendy shortly prior to the end of the marriage between Wendy and Kevin, Wendy essentially exercised unilateral control of the funds, and Wendy presented evidence to the trial court tracing the flow of the cash gifts from her father to the New Zealand account and into the court registry.

■  Second, Kevin makes a number of arguments which are all to the same effect: that by characterizing the money from the New Zealand account as Wendy's separate property, the superior court bestowed upon her a double recovery.[4] Kevin, however, adduces no meaningful record support for these arguments. As a result, none of the arguments warrants reversing the trial court's conclusion that the proceeds from the New Zealand account are properly classified as Wendy's separate property.

C.  *The Superior Court Erred by Directing Wendy to Place $100,000 in Trusts for Her Children.*

■  We next consider Wendy's argument that the superior court erred by directing her to place $100,000 in trusts for her children.

At the original trial, the superior court found that the $250,000 transfer from Wendy's father

> created a trust with Wendy as the trustee and the children as the beneficiaries. As trustee, Wendy would possess only bare legal title to the income and corpus of the trust, while the children possessed the beneficial interest. The superior court concluded that Wendy's bare legal title was marital property to be divided between the parties.

*Brown I*, at 3.

In *Brown I*, we reversed "the superior court's determination that the $250,000 was marital property." We also vacated the superior court's order "to the extent that it granted Kevin one-half of this money and subjected the entire sum to trusts for the benefit of the children." As mentioned above, we remanded this case to the superior court with specific instructions. We nowhere indicated in those instructions that the superior court should revisit the issue of whether the gift proceeds from Wendy's father should be placed in trusts for the children. Moreover, we stated that "[g]iven that the gift is the separate property of Wendy, it is unnecessary in this [divorce] proceeding to determine whether or not she holds it in trust for her children."[5]

Notwithstanding our statements in *Brown I*, on remand, the superior court made the following order:

> [T]he $50,000.00 each, previously put in the children's savings accounts, and then taken out by Wendy to invest in Trade, shall be re-deposited in accounts for the children, with both parents' names on it.

In so ruling, the superior court exceeded the mandate of this court and acted in a manner contrary to the law of this case. We therefore reverse the superior court's order that

---

3.  *See, e.g., Carlson v. Carlson*, 722 P.2d 222, 224 (Alaska 1986) (stating that "the act of commingling, in itself, does not automatically establish intent to jointly hold property, and a court always should consider the property's source when determining what assets are available for distribution"); *see also Gardner v. Harris*, 923 P.2d 96 (Alaska 1996); *Miles v. Miles*, 816 P.2d 129 (Alaska 1991).

4.  In particular, Kevin argues that

a look at each of the gifts demonstrates that they were either spent during the marriage; remained in accounts which Wendy ultimately received, and/or were invested in Trade Construction, Inc. and co-mingled with the profits.

5.  If the claim that Wendy holds the gifts in trust for her children were valid, it presumably could be brought in a separate action by a representative of the children or by Wendy's father.

$100,000 of Wendy's separate property must be placed in trusts for her two children.

## IV. DISCUSSION OF CHALLENGES TO THE SUPERIOR COURT'S "STEP THREE" ANALYSIS: THE SUPERIOR COURT'S FINDINGS DO NOT ADEQUATELY SUPPORT ITS DECISION TO AWARD KEVIN 100% OF THE MARITAL PROPERTY AND $81,000 OF WENDY'S SEPARATE PROPERTY

Finally, we consider Wendy's argument that the superior court's allocation of property in this case was an abuse of discretion.

As mentioned above, in *Brown I*, we directed the superior court to "decide whether the marital property of the parties should be divided differently and whether the equities of the case require invasion of Wendy's separate property."

On remand, the superior court concluded that the total value of the marital estate at the conclusion of the original trial was $159,-512.89.[6] The total value of Wendy's separate property at the conclusion of the original trial was $404,289.[7] The superior court then ordered a division of property.[8] The effect of the court's division would be to award

---

6. At the original trial, the superior court concluded that the value less the mortgage of one of the marital assets—the Snowy Owl property—was $40,000. Wendy submits that, as a result of market appreciation, mortgage payments, and renovations paid for in cash or accomplished as a result of Wendy's labor—all of which occurred after the divorce—she and her second husband currently have $100,000 in equity in the house.

There are some indications in the trial court's opinion on remand that the superior court may have implicitly adjusted upward the valuation of the marital estate by the amount of the post-trial appreciation in the Snowy Owl property. (The superior court there stated that, "one solution is to re-divide the marital assets and give Kevin more of those assets, which primarily is the [Snowy Owl] house.") There is no indication that the superior court adjusted the valuation of any of the other assets comprising the marital estate to account for any post-trial appreciation.

To the extent that the appreciation of the Snowy Owl property is attributable to Wendy's post-trial expenditures of effort or money, it would be error to increase the valuation of the marital estate. *See, e.g., Bousquet v. Bousquet*, 731 P.2d 1211, 1214 (Alaska 1987) (holding that assets acquired subsequent to separation are not considered marital property, absent evidence that spouse used marital property to obtain them); *Foster v. Foster* 883 P.2d 397, 399 (Alaska 1994) ("The date that the marriage has ceased to function as a single economic unit, often the date of separation, is the date after which newly acquired property should be considered non-marital property.").

To the extent that the appreciation of the property is attributable to post-trial market appreciation it would be, as Wendy argues, inappropriate to "single out one marital asset, the Snowy Owl Lane house, and value it alone six years after separation and five years after the trial." *See Moffitt v. Moffitt*, 813 P.2d 674, 678 (Alaska 1991) ("In some circumstances, it might be unjust to revalue only one asset at the date of the new trial while maintaining old values on all other assets which have been distributed.").

7. The basis for this figure is as follows: $359,289 currently is impounded in the court registry. The superior court concluded that the entire amount is Wendy's separate property. The superior court also determined that the Derby Tract lot is Wendy's separate property. At the time of the original trial, the value of the Derby Tract property was $45,000.

8. The superior court explained its allocation of property in this case as follows:

Wendy was able to run her own business, in large part, due to the generous loans and gifts from her father. However, she was also benefitted by Kevin having a regular salaried position with health benefits. Whether or not Trade made or lost money at a given point in time, Wendy had the security of Kevin being regularly employed. Wendy did not have to work at a job with a stable income to ensure she would have money for the family, because Kevin held a salaried position. When Trade was profitable, Wendy would pay herself a generous salary, and the family had additional money for new cars, trips, and so forth. Wendy was able to invest her father's gifts in Trade, local investment accounts, and New Zealand accounts, because she did not need the money to live on. Had Kevin not been working, some of this money may have been used for the support of the family, and not available for savings accounts in New Zealand. This Court does not find that it would be an equitable division to divide the property as suggested by Wendy, where she has all the money, and Kevin has none. On the other hand, Kevin's solution is for this Court to simply ignore the Supreme Court's decision and leave him with half of everything. Unfortunately, this proposed solution does not lend much guidance as to what would be a fair and equitable division, in light of the appellate mandates.

. . . .

The Court is faced with the problem of determining what would be a fair and equitable distribution and sees two options to equalize

Kevin (1) 100% of the marital estate as valued at the time of the original trial plus (2) approximately $81,000 of Wendy's separate property.[9]

Although, as indicated above, the superior court has "broad discretion" in determining when the equities of the case require invasion of premarital assets, *Julsen v. Julsen*, 741 P.2d 642, 646 n. 4 (Alaska 1987), whether the trial court applied the appropriate legal standard in exercising its broad discretion is a question of law. *Bays v. Bays*, 807 P.2d 482, 485 n. 4 (Alaska 1991).

▇▇▇▇ In performing the *Wanberg* "step three" analysis, the trial court generally should begin with the presumption that an equal division of marital property is most equitable. *Lowdermilk v. Lowdermilk*, 825 P.2d 874, 877 (Alaska 1992).[10] However:

> If at the third step the court finds that an equitable division is not possible using the marital property alone, then the court must determine whether invasion of separate property is necessary to balance the equities. AS 25.24.160(a)(4). If invasion is necessary, then the court must determine what separate property the parties own,

the distribution. Either the marital property is re-divided and Kevin gets a greater share, or some of Wendy's separate property needs to be invaded.... The Court finds that it is not equitable now to leave Kevin with very little separate assets, and Wendy with over $300,-000.00, plus the family home. The children are shared equally, and this would lead to widely disparate lifestyles.

9. The basis for this figure is as follows: At the conclusion of the original trial, Wendy paid Kevin $54,674.44 of her separate property. The trial judge did not reduce Kevin's award on remand to reflect this. Kevin was also awarded $67,787 of marital property. The superior court, on remand, ordered Wendy to convey to Kevin the Snowy Owl property or to pay him its "current value." On the assumption that, by its use of the term "current value," the superior court meant "current equity," Wendy has represented that her current equity in the house is approximately $100,000. The superior court also ordered Wendy to pay Kevin half the value of the Gig Harbor property ($5,500), and an additional $12,000. This awards Kevin $239,961.44. The marital estate is valued at $159,512.89.

10. *See also Hayes v. Hayes*, 756 P.2d 298 (Alaska 1988) ("While 50/50 division of marital property is presumptively just, an unequal division can be condoned when it is justified by relevant factors

value it, and adjust the initial division as needed.

*Murray v. Murray*, 856 P.2d 463, 466 (Alaska 1993) (citation omitted). In determining whether an imbalanced award of the *marital* assets is appropriate, the trial court should consider the *Merrill* factors as codified and expanded in AS 25.24.160(a)(4).[11] Moreover, in considering whether the invasion of *separate* property is necessary to balance the equities the trial court should:

> particularly consider factors such as the duration of the marriage, the conduct of the parties during the marriage, the manner of acquisition of the property, its value at the time of acquisition and at the time of the property division, and any other factors bearing on whether the equities dictate that the other spouse is entitled to share in that property.

*Vanover v. Vanover*, 496 P.2d 644, 648 (Alaska 1972).

▇▇▇ Against this backdrop, for three reasons, we vacate the superior court's property division in this case and remand for a new property division.[12] First, an examination of

identified in the findings of the court."); *Bousquet v. Bousquet*, 731 P.2d 1211, 1217 n. 14 (Alaska 1987) ("Moreover, there is a presumption that the most equitable division of the [marital] property is an equal division.").

11. The *Merrill* factors include:

the ages of the parties, their earning capacity, the duration of the marriage, the conduct of the parties during marriage, their "station in life," the circumstances and necessities of each, their health, their financial condition, the time and manner of acquisition of the property in question, the value of the property at the time of division, and the income-producing capacity of the property.

*Miller v. Miller*, 739 P.2d 163, 166 n. 3 (Alaska 1987).

12. Wendy has asked the court to vacate the property division ordered by the superior court and to order a 50/50 division of the marital property. We think that such a course of action would be inappropriate in view of the absence of detailed *Merrill/Vanover* findings by the trial court. *See Merrill v. Merrill*, 368 P.2d 546, 548 (Alaska 1962) ("As the case stands now we would have to assume the role of the trial court, weigh the evidence, draw reasonable inferences, make findings and determine the result. That is not our function or obligation.").

the superior court opinion on remand indicates that the trial court clearly failed to begin with the presumption that an equal division of *marital* property is the most equitable. Instead, the trial court appears to have begun with the presumption that an equal division of the marital property *and of Wendy's separate property* would be the most equitable.

Second, the trial court failed to address in any detail the factors set forth in *Vanover* and *Merrill.* Indeed, an examination of the remand opinion and the remand transcript suggests that the trial court was unaware of the existence of any standards regulating the exercise of its discretion.[13] Given the record in this case, the trial court's failure to make detailed *Merrill/Vanover* findings in support of its property division cannot be excused: it is not obvious from the record that Kevin's earning capacity is significantly lower than Wendy's; Kevin currently is thirty-eight years old and apparently is in good health, and it appears that Kevin brought little property into the marriage.

 Third, we have previously criticized as overbroad one of the trial court's primary stated justifications for its property division—that Wendy was "benefitted by Kevin having a regular salaried position with health benefits." *See Chotiner v. Chotiner,* 829 P.2d 829, 833 (Alaska 1992) ("Though Jennifer's financial contributions to the marriage were significant, they do not make Andrew's separate property marital. Such a result would mean that a non-working spouse would never be able to keep his or her inherited property separate.").

## V. CONCLUSION

AFFIRMED in part, REVERSED in part, VACATED in part, and REMANDED for additional proceedings in conformity with this opinion.

**13.** During the remand hearing, the superior court made the following two statements: "I wish I'd had more guidance from [the Supreme Court] as to what they wanted me to look at when I decide whether the equities require invasion of the separate property." "I mean [the Supreme Court] didn't set forth what criteria I'm supposed to use, but presumably you have some idea of what criteria I'm supposed to be looking at in deciding whether I should invade the marital ... the nonmarital property."