**William B. SAMPSON, Appellant,**

v.

**Susan M. SAMPSON, Appellee.**

No. S–9088.

Supreme Court of Alaska.

Dec. 15, 2000.

---

Peter F. Mysing, Kenai, for Appellant.

Allan Beiswenger, Robinson & Beiswenger, Soldotna, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

MATTHEWS, Chief Justice.

### I. INTRODUCTION

As part of a property division following a divorce, the trial court included William Sampson's inheritance from his mother in the marital property. William contests the trial court's conclusion that the inheritance was marital property. Because the trial court erred in concluding that the inheritance was marital property, we reverse and remand for a determination as to whether invasion of the inheritance as separate property is justified.

### II. FACTS AND PROCEEDINGS

#### A. Facts

Susan and William Sampson were married in 1981. They separated on September 20, 1996. There were no children born of the marriage.

During the first part of the marriage, the Sampsons resided in California, where William worked in retail sales. From 1981 to 1989 Susan worked as a police officer in Stockton. Her earnings exceeded William's. William had a child support obligation from a prior marriage that was paid with marital income.

In 1989 Susan resigned her job as a police officer for health reasons. She was unable to return to that job or find other permanent employment. As a result, the Sampsons lost their house, their car, and most of their possessions. They moved in with Susan's mother in early 1989.

In 1989 the Sampsons borrowed $10,000 from Susan's mother. In 1990 they moved to Anchor Point where they purchased a home, and William began to work in sales for a lumber yard. He remained at that job for the remainder of the marriage; Susan held no permanent job but worked intermittently.

William inherited securities in 1989 or 1990, following the death of his mother. William placed the securities, valued at around $266,000, in an account at A.G. Edwards in Stockton. The account was only in his name; Susan's name was never on the account.

At trial, the parties disagreed as to whether William had agreed to place Susan's name on the account and whether Susan was involved in the management of the securities. Initially, Susan told William that she did not want any part of the inheritance. However, Susan contended that William urged her to consent to have her name put on the account and that she resisted at first but ultimately told him, "Okay, fine. Go ahead and put my name on it." She further contended that he told her that he had put her name on the account. William denied that he ever told Susan that he would put her name on the account or that she told him he should put her name on the account. Susan also contended that the Sampsons made a joint decision about transferring money from one security to another because one holding was doing poorly. William denied that Susan had any involvement in any such transaction.

Periodically, William used income earned from the A.G. Edwards account to contribute to the marriage. At the time of trial, the account was worth approximately $312,000. The Sampsons felt that they did not need to worry about having enough money for their future, since William's inheritance was available. Although Susan wanted to leave Anchor Point because she believed that she could get a permanent job elsewhere, William resisted, in part because the inheritance money was available so Susan did not need to work.

In addition to the securities, William also inherited a fifty percent interest in his mother's residence. In 1993 the residence was sold to William's nephew for $80,000, and an escrow was established with monthly payments of $374 due to William. However, the nephew is in default and has made no payments for several years. William has a mortgage on the house and could foreclose but chooses not to do so. Susan was not involved with the management of this property.

In 1994 Susan cashed in her retirement account from her employment as a police officer. She testified that one of the reasons she cashed in her retirement was that she knew that William's inheritance would be available for their future needs. She received approximately $29,000 from her police retirement account. With that money, Susan purchased a vehicle, a boat, and a trip to China with her sister. She also paid some bills and normal living expenses.

After Susan and William separated, William continued to live in the marital home until April of 1997, when he was diagnosed with leukemia. William went to Seattle for treatment and underwent ten months of chemotherapy. While he was gone, Susan sold most of the marital possessions at a garage sale so that she would have money to live on. She received $4,480 for these items and kept that money. The marital residence was sold to a neighbor, and William and Susan split the proceeds equally. Susan spent her share of the money on daily living expenses. William added most of his share to the A.G. Edwards account.

Susan was forty-one years old at the time of the hearing. She lives with a friend who is a doctor and helps him with his practice. Susan's medical condition keeps her from finding other employment. She suffers from migraines and ulcers and her vision and hearing are impaired to some degree. She has no retirement benefits left from any source. The loan from her mother has not been repaid.

William was fifty-two years old at the time of the hearing. He lives in a small cabin outside of Homer, with no running water in the winter. William's medical condition prevents him from returning to work. His leukemia is in remission but he has decreased lung capacity because of a lung infection he incurred while hospitalized. William's expenses amount to approximately $1100 or $1200 per month. He receives Social Security benefits of approximately $965 per month.

### B. Proceedings

Susan filed for divorce on February 19, 1997, and Judge Harold M. Brown issued an opinion on November 12, 1998, following a trial. Judge Brown concluded that "a balancing of equities coupled with evidence of [William's] intent" to make the inheritance a marital asset "requires the inclusion of [William's] inheritance (including the Escrow account) in the marital estate." Judge Brown then divided the estate, giving sixty percent to William and forty percent to Susan.

William appeals.

### III. STANDARDS OF REVIEW

▆▆▆ The division of property in divorce cases is committed to the discretion of the trial court.[1] Property divisions require a three-step process: (1) determining what property is available for distribution as marital property, (2) valuing the property, and (3) equitably allocating the property.[2] These steps are reviewed under the abuse of discretion standard, and the division will not be disturbed unless it is clearly unjust.[3] A trial court's determination that the balance of equities between the parties requires that one party's separate property must be invaded is similarly reviewed for an abuse of discretion.[4]

---

1. See AS 25.24.160; Chotiner v. Chotiner, 829 P.2d 829, 831 (Alaska 1992).

2. See Chotiner, 829 P.2d at 831 (quoting Wanberg v. Wanberg, 664 P.2d 568, 570 (Alaska 1983)).

3. See Brown v. Brown, 947 P.2d 307, 308–09 (Alaska 1997).

4. See Ross v. Ross, 496 P.2d 662, 664 (Alaska 1972).

IV. *DISCUSSION*

■■■ There is a strong presumption that inherited property is separate property not to be included in the disposition of property during a divorce.[5] "Inherited property is separate, even if received during marriage."[6] However, inherited property may be conveyed to the marital estate when that is the intent of the owner and conduct demonstrates that intent.[7] In addition, separate property may be invaded where the balancing of equities requires it.[8]

William argues that the trial court abused its discretion in treating the inheritance as marital property. He also contends that invasion of his separate property was an abuse of discretion. Susan defends the trial court's decision.

A. *It Was Error to Find the Inheritance Was Converted to Marital Property.*

In *Cox v. Cox*[9] we listed some of the circumstances which can lead to a transmutation of separate property into marital property. These included "(1) the use of property as the parties' personal residence, and (2) the ongoing maintenance and managing of the property by both parties, as well as (3) placing the title of the property in joint ownership and (4) using the credit of the non-titled owner to improve the property."[10] Although the first factor applies only to real property, the other factors, where appropriate, can apply to both real and personal property.[11]

William argues that the trial court clearly erred in finding that he intended to make the inheritance marital property. William contests the court's factual findings that he led Susan to believe the assets were hers by saying that they were available during the marriage and that Susan expended her re-

tirement in reliance on William's inheritance. Each of these arguments is discussed below.

1. *William's belief and his representation to Susan that the assets were available did not demonstrate an intent to treat the inheritance as marital property.*

■■■ Both Susan and William agree that they viewed the A.G. Edwards account as a resource for their future. In *Lundquist v. Lundquist* we reversed a trial court's determination that an inheritance was marital property.[12] The trial court found that the inheritance was marital property because the owner considered it to belong to both himself and his wife while they were married.[13] We concluded that "George's testimony that he assumed that all property received during the marriage should be shared is not sufficient to overcome the strong presumption that an inheritance is separate property."[14] William argues that he, similarly, should not be faulted for assuming and acknowledging during the marriage that his inheritance would benefit both of them while they were married. Once divorced, William contends, Susan is not entitled to the money.

Susan distinguishes *Lundquist* because in that case the money was inherited less than two months prior to separation, whereas William inherited the assets six years before their separation.[15] She contends that the existence of the inheritance and William's representations that it would be available affected her financial decisions.

William is correct that his belief and representation that the inherited assets would be available to them during the marriage do not suffice to warrant a finding that the assets were converted to marital property. His

---

5. *See Julsen v. Julsen,* 741 P.2d 642, 646 (Alaska 1987).

6. *Chotiner,* 829 P.2d at 832 (citing *Julsen,* 741 P.2d at 648).

7. *See Chotiner,* 829 P.2d at 832.

8. *See Burrell v. Burrell,* 537 P.2d 1, 3 (Alaska 1975); AS 25.24.160(a)(4).

9. 882 P.2d 909, 916 (Alaska 1994).

10. *Id.* (internal citations omitted).

11. *See Rhodes v. Rhodes,* 867 P.2d 802, 804 n. 5 (Alaska 1994).

12. 923 P.2d 42 (Alaska 1996).

13. *See id.* at 49.

14. *Id.*

15. *See id.*

statement that the inheritance would be available to them must be understood as referring to the period during which the parties remained married.

### 2. *Susan's reliance on William's inheritance does not prove that William intended to transmute the inheritance.*

█ William argues that he never promised Susan that the inheritance would be available as an incentive for her to cash in her retirement. Susan argues that both parties viewed the inheritance as a "hedge" against their old age, so she and William jointly decided that it would not be a problem for her to cash in her retirement. She also argues that the decision not to relocate from Anchor Point was predicated upon the belief that Susan did not need to work because the inheritance money was available.

The testimony shows that Susan believed that it was safe to cash in her retirement because William's inheritance was there and that when they discussed the matter, William told her she could cash it in if she wanted, but made no promise regarding the inheritance. Susan then elected to cash in the retirement. William took no action demonstrating an intent to convert his inheritance into marital property. William's general statements that he viewed that money as a hedge for them for the future while he and Susan were married were not evidence of an intent to transmute.

The Sampsons decided not to relocate, in part, because Susan did not need to work since there was income from the inheritance. However, this does not establish that William intended to transmute the inheritance. Rather, it is consistent with William's belief that, while they were married, they would enjoy the benefits of his inheritance, as in *Lundquist.*[16]

Because William made no promises to Susan upon which she relied, and because the

decision to cash in her retirement was made by Susan, the finding that William intended to transmute his inheritance into marital property is clearly erroneous.

### B. *The Issue of Invasion of Separate Property Should Be Determined on Remand.*

█ An equal division of the marital property is presumed to be equitable.[17] However, if the trial court concludes that equitable distribution is not possible using the marital property alone, then it must determine whether it is necessary to invade separate property to balance the equities.[18]

The trial court said that "a balancing of the equities coupled with evidence of [William's] intent requires the inclusion of [William's] inheritance (including the Escrow account) in the marital estate." This analysis runs together the doctrines of transmutation of separate property into marital property and invasion of separate property.

█ Transmutation considers whether there was an intent to include the inheritance in the marital estate. Transmutation is not based on equities, but on the intent of the owner of the separate property, as demonstrated through his words and actions.[19] As explained above, William did not intend to include his inheritance in the marital property. But invasion of separate property considers whether "the balancing of the equities between the parties requires" invasion.[20] It is impossible on this record to determine whether the trial court would have invaded William's inheritance if it had correctly found that the inheritance was separate property. A remand is therefore necessary so that the court can determine whether on a balance of the equities between the parties invasion of William's separate property is required and, if so, the extent to which invasion is required.

In making these determinations we have stated generally that the factors governing

**16.** *See id.*

**17.** *See Nicholson v. Wolfe,* 974 P.2d 417, 422 (Alaska 1999).

**18.** *See Brown v. Brown,* 947 P.2d 307 (Alaska 1997).

**19.** *See Cox v. Cox,* 882 P.2d 909, 916 (Alaska 1994).

**20.** AS 25.24.160(a)(4).

the division of marital property identified in *Merrill v. Merrill* apply.[21] In deciding whether separate property should be invaded, we have stated that courts

> should particularly consider factors such as the duration of the marriage, the conduct of the parties during the marriage, the manner of acquisition of the property, its value at the time of acquisition and at the time of the property division, and any other factors bearing on whether the equities dictate that the other spouse is entitled to share in that property.[22]

■■ Our case law also contains indications of at least two things that courts should not do in making an invasion decision. First, in *Brown* we indicated that it was error for the trial court to begin with the presumption that an equal division of marital property *and* of separate property is the most equitable solution .[23] Second, we have warned against an assumption that an invasion of separate property is justified merely because the spouse who does not own separate property has worked and thus contributed to the marital estate.[24]

■ In this case Susan features as reasons for invasion of William's separate property her poor health, inability to work full time, lack of substantial marital property or separate property owned by her, and her claim that during the course of the marriage the availability of William's inheritance caused the parties to make decisions involving their marital assets and their financial future which had a direct bearing on the relatively low value of their marital estate. We consider that all of these factors are appropriate for consideration by the trial court in deciding whether the balancing of the equities between the parties requires invasion of William's separate property and, if so, the extent to which invasion is required.

## V. CONCLUSION

It was an abuse of discretion to determine that William intended to turn his separate property into marital property. We therefore REVERSE this holding. Because the trial court did not determine whether invasion is justified based on a balance of the equities, we REMAND for such a determination. Further, if the court finds that invasion of separate property is justified, the court should divide the separate property in accordance with the principles set forth in this opinion.

---

21. 368 P.2d 546, 547–48 n. 4 (Alaska 1962). The factors include:

> the ages of the parties, their earning capacity, the duration of the marriage, the conduct of the parties during marriage, their "station in life," the circumstances and necessities of each, their health, their financial condition, the time and manner of acquisition of the property in question, the value of the property at the time of division, and the income-producing capacity of the property.

*Brown,* 947 P.2d at 313 n. 11; *Vanover v. Vanover,* 496 P.2d 644, 647–48 (Alaska 1972).

22. *Vanover,* 496 P.2d at 648; *Brown,* 947 P.2d at 313.

23. 947 P.2d at 314.

24. *See id.*