William L. ODOM, Appellant/Cross–Appellee,

v.

Carey P. ODOM, Appellee/Cross–Appellant.

Nos. S–11905, S–11925.

Supreme Court of Alaska.

Aug. 11, 2006.

**23.** WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1399.

Bruce A. Bookman, Bookman & Helm, Anchorage, for Appellant and Cross–Appellee.

Peter J. Maassen, Ingaldson, Maassen & Fitzgerald, P.C., Anchorage, for Appellee and Cross–Appellant.

Before: BRYNER, Chief Justice, MATTHEWS, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

These cross-appeals arise from a judgment concerning custody and dividing property in a divorce proceeding. William (Bill) Odom challenges as excessive the amount by which his separate estate was invaded as well as the award of primary physical custody of the children and the "ancestral home" to his former wife, Carey Odom. Carey cross-appeals the characterization of Bill's interests in his family company as separate property and also challenges as inadequate the amount by which Bill's separate property was invaded. Because the superior court did not abuse its discretion in determining custody or in awarding the ancestral home, we affirm both decisions. Because Carey did not meet her burden of showing that Bill's separate interests had become marital property, we affirm that decision. But because the invasion of Bill's separate property in the amount of $2,250,000 was erroneous, we vacate that determination and remand for further proceedings.

## II. FACTS AND PROCEEDINGS

Bill and Carey Odom were married on June 16, 1990 and have two children, Brittany, born in 1994, and Hilary, born in 1997. The parties separated in May 2002. The superior court issued its findings of fact and conclusions of law, decree of divorce, and child custody order on February 22, 2005. Bill filed a motion to reconsider, which was granted in part and denied in part.[1] This appeal and cross-appeal followed.

### A. The Custody Order

Bill and Carey were awarded joint legal custody. Bill was also required to pay child support of $2,500 monthly, all private school expenses, and the children's health insurance. Bill does not appeal these rulings and challenges only the physical custody order. The superior court had issued an interim order whereby Carey was awarded primary physical custody on weekdays during the school year, with Bill having weekend, holiday, and extended summer visitation rights. At the trial, Carey sought to have this interim order made permanent while Bill sought

---

1. The superior court acknowledged an inconsistency in its language in the first order and ordered both the Anchorage house and the debt associated with it to Carey. Bill's other motions were denied.

joint physical custody in the form of a two-week-on, two-week-off schedule.

The superior court awarded Carey primary physical custody and provided Bill visitation with the children three weekends per month (from Friday after school to Sunday evening or to school on Monday morning "as the parties may agree"), alternate Thanksgivings, shared Christmas vacations, and Father's Day. In addition, he was allowed a three-week block of time during the summer. Additional visitation could be arranged as agreed upon jointly by Bill and Carey. Bill appeals the award of primary physical custody to Carey.

## B. The Award of the Anchorage Home

Bill appeals the award of the Odom family home in Anchorage to Carey. Because it was his family home, Bill had repeatedly requested that he be awarded the Anchorage home during trial. But the superior court awarded the Anchorage house to Carey because she had been awarded primary physical custody of the children. The superior court took notice of the fact that Bill had a "substantial attachment to the home" and therefore awarded Bill the right of first refusal to purchase the home should Carey predecease Bill or choose to sell the house. Bill appeals the award of the Anchorage house to Carey.

## C. The Property Division

A primary issue at trial was whether Bill's interests in Odom Enterprises [2] had become part of the marital estate. The superior court found that Bill's interests were separate property but determined that an equitable distribution demanded that it be invaded. This invasion raised the question of the extent to which Bill's separate estate was to be invaded.

Bill's interests in Odom Enterprises include interests in the Odom Company as well as in two related partnerships. The Odom Company was founded by Bill's father, Milt Odom. Milt Odom died in 1988, before Bill and Carey's marriage. At the time of Milt

Odom's death, Bill owned 7% of the Odom Company shares and that amount had decreased to 5.6% by the time of trial. Bill's 5.6% holding would be worth $1,139,062 based on the price of $116 per share, a value presented by Bill's experts to the superior court. In addition, Milt Odom's estate is expected at some future date to distribute Milt Odom's share of the company to each of the three Odom brothers; Bill will then own approximately one-third of the company. That distribution is not likely to occur for another eight years due to tax issues.

Bill also owns a one-third interest in two partnerships that are related to the Odom Company: the Odom Brothers Partnership and the Odom Real Estate Partnership. The first partnership was created in 1994 by the Odom Company as part of its business plan and was neither Bill's idea nor managed by Bill. The second partnership was created in 1989, before Bill and Carey's marriage. Bill's shares in the two partnerships were valued at $84,760 and $477,984, respectively.

The superior court estimated that the value of Bill's interests in Odom Enterprises, including his undistributed inheritance, totals at least $6.3 million and may be worth as much as $8.6 million. Because Bill's interests were inherited before the marriage, or created using entirely premarital assets, they were presumptively unavailable for distribution in the divorce. There is no dispute that Bill's undistributed inheritance from his father's estate is separate property. But Carey argued in the trial below that Bill's interests in the Odom Company and partnerships had become part of the marital estate as a result of the doctrines of either active appreciation or transmutation. The superior court found that neither doctrine applied and that Bill's interests had not become part of the marital estate.

In its distribution of the marital estate, the superior court awarded Bill approximately $57,000 more than Carey. In making the division, the superior court found that the Odoms' lifestyle had been "one of unusual opulence and privilege" and commented that the value of the estate was relatively small

**2.** For the purposes of this opinion, the term "Odom Enterprises" is used to indicate both the Odom Corporation (the Company) and the two related partnerships.

"due to deliberate choices" made by Bill and his brothers whereby Odom Company assets were used to pay substantial household expenses. The superior court also noted that Bill's separate property "has considerable income generating capacity" while "there is no likelihood that [Carey] would ever be able to generate an income level that even remotely resembles the manner of lifestyle [to] which she and the children have been accustomed."

The superior court therefore proceeded to examine the *Merrill* factors codified in AS 25.24.160 and determined that in order to balance the equities it must invade Bill's separate property as allowed under AS 25.24.160(a)(4). Bill was ordered to pay $2,250,000 to Carey within one year of the superior court's order (dated February 22, 2005) and to pay $8,000 a month in spousal support to Carey until that sum was paid. The superior court recognized that Bill's obligations might impose a hardship "in terms of cash flow" but found that Bill had the ability to obtain loans or sell his interests in order to make the payments and, furthermore, that if Bill were to suffer hardship, "he must bear the brunt of those problems as they result from the decisions that [he] and his brothers have made as to how the assets of their various enterprises would be used."

Bill appeals as excessive the amount by which his separate property was invaded, as well as the finding that he had the ability to pay a lump sum amount of $2.25 million. In her cross-appeal, Carey disputes the characterization of Bill's interests as separate property and, in the alternative, challenges as

inadequate the amount by which the separate estate was invaded.

## III. STANDARD OF REVIEW

The division of the marital estate requires first that property owned by the parties be characterized as separate or marital, that the marital property then be valued, and finally that the marital property be allocated equitably.[3] The characterization of property as separate or marital may involve both legal and factual questions.[4] Legal questions are reviewed de novo[5] and in so doing we "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[6] We review findings of fact under the clearly erroneous standard.[7]

We review the distribution of property under the abuse of discretion standard and will reverse that distribution if it is clearly unjust.[8] The equal division of the marital estate is presumptively valid.[9] Whether or not the equities require invasion of premarital assets is reviewed for abuse of discretion.[10] "We review de novo whether the trial court applied the correct legal rule in exercising its discretion."[11]

The superior court has broad discretion in child custody decisions.[12] "A trial court's determination of custody will be set aside only if the entire record demonstrates that the controlling findings of fact are clearly erroneous or that the trial court abused its discretion."[13] Findings of fact are set aside "if a review of the entire record firmly convinces us that a mistake has been made."[14] We find an abuse of discretion "if the trial

3. *Martin v. Martin,* 52 P.3d 724, 726 (Alaska 2002).

4. *Id.*

5. *Id.*

6. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

7. *Martin,* 52 P.3d at 726.

8. *Bellanich v. Bellanich,* 936 P.2d 141, 143 (Alaska 1997).

9. *Brooks v. Brooks,* 733 P.2d 1044, 1058 (Alaska 1987).

10. *Chotiner v. Chotiner,* 829 P.2d 829, 834–35 (Alaska 1992).

11. *Schmitz v. Schmitz,* 88 P.3d 1116, 1122 (Alaska 2004).

12. *Chesser–Witmer v. Chesser,* 117 P.3d 711, 715 (Alaska 2005).

13. *Hamilton v. Hamilton,* 42 P.3d 1107, 1111 (Alaska 2002).

14. *Schmitz,* 88 P.3d at 1121.

court considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others."[15]

## IV. DISCUSSION

### A. The Custody Award

 Although Bill sought equal physical custody of his and Carey's two children and asked for a schedule of two weeks on and two weeks off, the superior court awarded primary physical custody to Carey. Bill was awarded three weekends each month, alternate holidays with shared Christmas vacations, and three weeks in the summer. Bill disputes the factual findings made by the superior court and appeals the award of primary physical custody to Carey. Because the custody award was within the discretion of the superior court, we affirm.

The superior court relied on the fact that Carey had been the children's primary caregiver on a full-time basis and was an excellent mother. The superior court additionally found that Bill "tends to place his own needs and interests above those of the girls." Bill disputes these findings. Bill also complains that the final custody arrangement awarded him even less visitation with the children than had the interim custody arrangement because it provided for only three, rather than all, weekends per month with the children.

 Custody determinations are to be made based on the best interests of the child. Alaska Statute 25.24.150(c) provides a list of factors to be considered in determining the children's best interests. The superior court may properly conclude that awarding custody to the primary caregiver will establish greater emotional stability for the purposes of AS 25.24.150(c)(5), which requires the

court to consider the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity.[16] Additionally, there are many reasons why the children's best interests might require one weekend a month to be spent with their mother. It is the function of the superior court to judge witness credibility and to weigh conflicting evidence.[17] Because the superior court did not abuse its discretion, we affirm the award of physical custody to Carey and the visitation schedule.

### B. The Award of the Anchorage House

 At trial, Bill sought to be awarded the Anchorage home which belonged to his father and was where he was born and raised. The home contains many Odom family "heirlooms."[18] To help Carey find a new home, Bill had proposed that she be given six months to locate another home (financed in part by Bill). But the superior court awarded the home and its contents to Carey because it had awarded Carey primary physical custody of the children. Because that award was not an abuse of discretion, we affirm.

Bill attacks the superior court's reasoning on several grounds. First, he addresses the link that the superior court made between the award of custody and the award of the Anchorage home. Bill argues that if the award of the home was based on the custody decision, then Carey should have been required to sell the house to Bill once the children left home. Second, Bill argues that custody decisions by themselves should not determine property division decisions.

But both of these arguments have little merit. Alaska Statute 25.24.160(a)(4)(F) directs the superior court to consider "the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physi-

---

**15.** *Hamilton*, 42 P.3d at 1111.

**16.** *Veselsky v. Veselsky*, 113 P.3d 629, 635 (Alaska 2005).

**17.** *In re Adoption of A.F.M.*, 15 P.3d 258, 262 (Alaska 2001).

**18.** The heirlooms were one of the subjects of the motion to reconsider filed by Bill. The motion was denied; the superior court stated that "[e]vi-

dence was not presented as to specific items to which Mr. Odom is sentimentally attached and [it] was the Court's intent that the Anchorage home be conveyed to Ms. Odom fully furnished. If the parties wish to negotiate alternative arrangements ... they are free ... and ... encouraged to do so."

cal custody of [the] children." It is well within the broad discretion of the superior court to determine how a marital asset should be allocated at trial.[19] The superior court noted that the children had lived in the Anchorage home "their entire lives." And the trial court recognized Bill's attachment to the home by awarding him a right of first refusal to purchase it should Carey predecease him, or should she choose to sell it during her lifetime. Because it was well within the superior court's discretion to award the family home to Carey, we affirm on this issue.

## C. The Characterization of Odom Enterprises as Bill's Separate Property

The characterization of property owned by the parties to a divorce as marital or separate is the essential first step in the equitable division of property. Therefore, we examine the merits of Carey's challenge to the superior court's determination that Bill's interests in Odom Enterprises were separate before addressing Bill and Carey's appeals of the amount by which that separate property was invaded.

### 1. The superior court did not err in its characterization of Bill's interests in Odom Enterprises as separate property.

The superior court found that Bill's interests in both the Odom Company and the partnerships were separate property. Carey appeals that determination and argues that Bill's interests became marital property under the doctrines of either transmutation or active appreciation.

#### a. Transmutation

 "Transmutation occurs when married parties intend to make a spouse's separate property marital and their conduct during marriage demonstrates that intent."[20] The central issue in determining transmutation is "the intent of the owner of the separate property, as demonstrated through . . . words and actions."[21] If transmutation is found, the property becomes entirely marital.[22] In this case, the superior court determined that the doctrine of transmutation was inapplicable to Bill's assets. Carey argues that Bill's interests in both the company and the partnerships became marital assets through transmutation in two ways: (1) the "untraceable commingling" of assets[23] and (2) the treatment of the asset as "a joint holding."[24] We disagree and uphold the superior court's conclusion that Bill's interests in the company and partnerships did not become marital through transmutation.

 Carey first argues that Bill's separate assets became marital through transmutation as a result of commingling. Her argument is essentially that because Bill used his company account as the "main checking account" to pay bills for the marriage, the company account transmuted into marital property. But it is well established in Alaska that the mere commingling of separate property with marital property does not lead to a finding of transmutation.[25] "Using part of a premarital account for a marital purpose does not change the balance of the [premarital] account into marital property so long as no new contributions of marital funds to the [premarital] account are made."[26] Thus, while Bill's payment of money for marital bills out of his separate account converts the money actually used into marital property, it does not, without more, convert the

**19.** *Cox v. Cox*, 882 P.2d 909, 913 (Alaska 1994).

**20.** *Harrower v. Harrower*, 71 P.3d 854, 857 (Alaska 2003).

**21.** *Green v. Green*, 29 P.3d 854, 857 (Alaska 2001) (alteration in original).

**22.** *Miller v. Miller*, 105 P.3d 1136, 1141 (Alaska 2005).

**23.** *Schmitz*, 88 P.3d at 1128–29.

**24.** *Beal v. Beal*, 88 P.3d 104, 119 (Alaska 2004).

**25.** *See, e.g., Abood v. Abood*, 119 P.3d 980, 984 (Alaska 2005).

**26.** *Hansen v. Hansen*, 119 P.3d 1005, 1014 (Alaska 2005); *see also Gardner v. Harris*, 923 P.2d 96, 99–100 (Alaska 1996) (using separate property bonds as collateral to obtain a favorable interest rate on a marital loan did not transmute the bonds into marital property).

entire separate account into marital property.

Carey's second argument relies on the "joint holding" theory of transmutation. Separate property can become marital if "the parties, by their actions during marriage, demonstrate their intention to treat [separate] property as joint holdings."[27] Carey alleges that Bill's intent to make his interests in the Odom Company marital is evidenced by the fact that Bill and Carey's marital finances were enhanced in large part by perquisites supplied by Odom Enterprises in the form of paying the bills for vacation residences, travel, and transportation, as well as for housekeepers, the cars' fuel and insurance costs, and the maintenance and painting of houses. As Carey put it, "every aspect of the Odoms' opulent and privileged marital life was supported, in whole or substantial part, by the Odom [E]nterprises' money." She claims that the support of Odom Enterprises of the marital life was pervasive to the extent that the "line between separate and marital property [became] so thin as to be substantively meaningless."

But when determining whether separate property has transmuted into marital property, we have previously determined that the mere use of an asset's proceeds for marital purposes is insufficient.[28] In affirming findings of transmutation, we have taken into account the active involvement of both parties in the "ongoing maintenance, management and control of the property";[29] a pool-ing of both parties' "time, talents, and any premarital assets that they had" into the joint holding;[30] or a showing that the owner-spouse "made no attempts to maintain the separate character of this property."[31]

But in this case, there is no evidence beyond mere use of the asset's proceeds to fund marital activities to support a joint holding theory of transmutation. Carey did not maintain or manage Bill's separate property. Carey's name was not on any of the company's bank accounts; her credit was not used for any bank loans; and she never held any Odom stock. Carey was not involved in planning the details of company business and conceded that she played no role in the management of the company or the partnerships. Finally, Carey was aware that the Odom brothers did not want their wives working in the business or to have ownership interests in the shares owned by the brothers. These factors together indicate not only that Carey did not maintain or manage the separate property but also that Bill intended and made active efforts to ensure that his property remained separate.[32] Because the mere use of a separate asset for marital purposes cannot transform the separate asset into a marital asset, Carey's transmutation argument fails.

### b. Active appreciation

"Active appreciation occurs when marital funds or marital efforts cause a spouse's separate property to increase in value during the marriage."[33] Under this theo-

---

27. *Wanberg v. Wanberg,* 664 P.2d 568, 571 (Alaska 1983).

28. *Cf. Abood,* 119 P.3d at 988 (requiring factors such as "the ongoing maintenance and managing of the property by both parties," as well as "placing the title of the property in joint ownership" and "using the credit of the non-titled owner to improve the property" in addition to "the use of the property as the parties' personal residence").

29. *Keturi v. Keturi,* 84 P.3d 408, 418 (Alaska 2004).

30. *Green,* 29 P.3d at 858.

31. *Miller,* 105 P.3d at 1141.

32. *See, e.g., Nicholson v. Wolfe,* in which the following was not considered transmutation absent a specific finding of intent:

> The record indicates that Nicholson maintained title to the Northstar assets in his name alone; he meticulously kept separate records, so that Wolfe was unaware of the assets and debts of the business, and exerted minimal control over them; Wolfe never assumed any liability for the business, nor did she co-sign any business loans; Nicholson spent little or no marital monies on the business. According to Wolfe, she helped set up Northstar's books (although she apparently did not maintain them), answered the business phone, and occasionally accompanied Nicholson "on *his* business activities." (Emphasis added).

974 P.2d 417, 423–24 (Alaska 1999).

33. *Harrower,* 71 P.3d at 857.

ry, any increase in value of Bill's separate interests subsequent to the date of marriage is treated as marital property to the extent that the increase "results from active marital conduct: 'Appreciation in separate property is marital if it was caused by marital funds or marital efforts; otherwise it remains separate.' "[34] For this doctrine to apply, there must be (1) appreciation of separate property during marriage; (2) marital contributions to the property; and (3) a causal connection between the marital contributions and at least some part of the appreciation.[35] Carey bears the burden on the first two elements [36] and Bill bears the burden of proving the absence of a causal link between his efforts and any appreciation in value of his separate property during marriage.[37]

In determining whether active appreciation applies to Bill's interests, a distinction must be made between Bill's interests in the Odom Company and those in the related partnerships. With regard to the Odom Company, the superior court found that it had not increased in value during the marriage and, therefore, the doctrine of active appreciation did not apply. As for the partnerships, the doctrine was found not to apply for two reasons: first, because any increase in value in the partnerships was passive, and second, because no marital contribution was made to the property.

### i. The Odom Company

We first discuss Bill's interests in the Odom Company. The superior court did not reach the second and third elements of the doctrine of active appreciation because it found that the Odom Company had not increased in value during the marriage. At trial, Bill presented evidence from two ex-perts to explain that the Odom Company, and by extension his interests in the company, had not increased in value. Although she bore the burden of proof and was aware that the valuation of assets would be an issue in the division of assets upon divorce, Carey presented no experts to counter the testimony of Bill's experts at trial. And although Carey claims that her cross-examination of Bill's experts was sufficient to impeach their testimony, the trial court did not find her evidence to be credible. Carey now challenges the superior court's application of the doctrine of active appreciation. In the alternative, she disputes the findings of Bill's experts and points to other economic indicia to claim that the Odom Company did increase in value. Because the superior court was correct in its application of the doctrine of active appreciation, we affirm the superior court's finding that the Odom Company did not increase in value.

Carey's first approach is to challenge the superior court's interpretation of the doctrine of active appreciation. She makes two arguments: (1) that inflation should not be taken into account when determining whether an asset has appreciated in value; and (2) that any asset that is actively managed satisfies the active appreciation test whether or not it has increased in value. Neither claim is in accord with our decisions in this area.

First, Carey argues that adjustments for inflation or other passive economic factors should not be taken into account when determining the value of an asset. Instead, she argues that the proper test is fair market value. Thus, an asset worth $80 ten years ago and $116 today should be considered to have appreciated by $36.[38] But this

34. *Id.* at 858 (quoting Turner, Equitable Distribution of Property § 5.22, at 230 (2d ed.1994)).

35. *Schmitz*, 88 P.3d at 1125.

36. *Id.* at 1125–26 (quoting Turner, Equitable Distribution of Property § 5.22, at 236 (2d ed. 1994)) ("There is general agreement that the burden of proving marital contributions and the burden of proving an increase in value are on the spouse who seeks to classify appreciation as active.").

37. *Schmitz*, 88 P.3d at 1125–26 (citing *Harrower*, 71 P.3d at 859 ("Cases divide as to who bears the burden on the third element, causation. The majority view would assign it to [appellant], requiring him to prove the absence of a causal link between his efforts ... and any appreciation in his stock that occurred during the marriage.")).

38. In support of her argument, Carey cites to *Hayes v. Hayes*, 756 P.2d 298, 300 (Alaska 1988), where we noted that "[t]he concept of value is keyed to the price that a prospective buyer would pay." But this cite is inapposite. In that case we were discussing whether a minority discount

argument is not in accord with our practice, which is to take into account inflation and purchasing power of the dollar. In *Brooks v. Brooks,* for example, we defined passive appreciation as "appreciation that occurs without any significant contribution being made toward that increase by either spouse (i.e. inflation or other economic factors beyond the spouse's control)." [39]

■ Carey's second argument, that any asset that is actively managed satisfies the active appreciation test, whether or not it has increased in value, is also not in accord with Alaska law. Carey argues that the superior court misunderstood the doctrine of active appreciation because it is the causal element, rather than value, that ought to be key to the discussion. In essence, Carey argues that the fact that the share price of the Odom Company fluctuated over time or did not fall even further in value by the time of separation is due to the active efforts of Bill and his brothers. Carey cites to *Brooks*[40] for the proposition that passive appreciation can only occur in the absence of any active marital efforts. Under her theory, the only way for there not to have been active appreciation in an asset, whether or not the asset had objec-

tively increased in value, would be for the asset to sit "idle for the duration of the marriage."

But Carey's approach conflates the elements of the test for active appreciation and misreads *Brooks.* The test requires that the value of the asset have actually increased before the discussion may turn to whether that increase was due to active or passive forces. In *Brooks,* for example, the fact that the asset had increased in value had already been determined [41] and we were concerned with determining whether the appreciation in value was due to passive forces or to active efforts on the part of the spouse.[42] Most recently, in *Hanson v. Hanson,* we made it clear that the trial court must first determine whether the asset increased in value before proceeding with the other elements.[43] This approach is in accord with decisions from other jurisdictions, which also require that it first be determined whether the asset increased in value before moving to the other parts of the test.[44]

■ The doctrine of active appreciation cannot take into account the fluctuations of an asset's value through time. Turner

---

should be applied to the valuation of the spouse's separate property. *Id.* at 299–300. We were not discussing the effect of inflation on the valuation of an asset.

**39.** 733 P.2d at 1054 & n. 22 (Alaska 1987) ("[T]he $625,000 appreciation in the apartment complex's value appears to have been passive rather than active. In other words, the property's increased value was caused solely by inflation and/or other economic factors to which [the spouse] in no way contributed."); *see also Hansen,* 119 P.3d at 1014 n. 42 (Alaska 2005) (quoting *In re Marriage of Gottsacker v. Gottsacker,* 664 N.W.2d 848, 853 (Minn.2003) ("[A]n increase in the value of nonmarital property attributable to inflation or to market forces or conditions, retains its nonmarital character.")).

**40.** 733 P.2d at 1054.

**41.** *Id.* ("[The husband] bought the complex for $300,000 in February of 1976. In August, 1985 [the property] was appraised at $925,000. During the period of the Brooks[es]' marriage, the record does not indicate that any major repairs or improvements were made to the property. Thus, the $625,000 appreciation in the apartment complex's value appears to have been passive rather than active.").

**42.** *Id.*

**43.** 125 P.3d 299, 305 (Alaska 2005) ("Turning to the specific elements of active appreciation, we first look to whether the record shows that [the asset] gained value during the course of the marriage."). In *Hanson,* we remanded for a finding as to the value of the asset at the beginning of the marriage, since neither party had presented such evidence before the court; in this case, however, ample evidence of the value of the asset was presented before the court.

**44.** *See, e.g., Smith v. Smith,* 197 W.Va. 505, 475 S.E.2d 881, 888 (1996) ("The court enunciated specific issues to be determined by the lower court upon remand, including (1) the value of the interest in the corporation at the time of acquisition, (2) the value of the interest at the date of separation, (3) the difference between the two, and (4) 'the [proportion] of that difference that is due to active appreciation, i.e., attributable to funds, talent, or labor that are assets of the marital community. The resulting amount is marital property subject to equitable distribution.'" (quoting *McLeod v. McLeod,* 74 N.C.App. 144, 327 S.E.2d 910, 915 (1985), *overruled on other grounds, Dunlap v. Dunlap,* 85 N.C.App. 324, 354 S.E.2d 734, 736–37 (1987))).

illustrates this principle when he notes that if a $100,000 business increases in value to $150,000 during the marriage because of active efforts, but then drops back in value to $100,000 by the time of separation due to market forces, then there is simply no marital interest to divide.[45] Turner does not suggest that marital contributions be parsed such that an increase in one year be compared to a decrease in another or examined as to whether they stopped the business from further plummeting in value. In *Foster v. Foster*, we acknowledged that the spouse had made improvements to the property.[46] But because those improvements were all in a state of disrepair by the time of trial, there was no evidence that his efforts had added to the fair market value of the property, and we thus affirmed the trial court's denial of an award based on the value of the work he performed.[47] In valuing assets upon divorce, it is a settled principle that the asset is valued on a date certain, even if the vagaries of market forces might cause the value of the asset to be unusually high or low on that date.[48] Therefore, Carey's attempt to dispute the superior court's rejection of the applicability of the doctrine of active appreciation must fail.

■ In the alternative, Carey challenges Bill's experts' determination that Bill's interests in the Odom Company had not increased in value. At trial, Bill presented the testimony of Dr. Richard Parks, who qualified as an expert economist and who compared the value of the shares of the Odom Company at the time of marriage to that at the time of separation. The initial share price was an average of a price of $80 used in a minority redemption transaction in 1990 and a price of $89.64 used in a buy-out of the fourth Odom brother in 1992.[49] The final share price of $116 was based on valuation undertaken by the company's independent advisor, T.S. Leung, on March 31, 2002 (the Leung Report).[50] Dr. Parks's comparison found no real increase in the value of the company and determined instead that the company had failed to keep pace with inflation and had far underperformed as compared to several industry and stock market standards. The Odom Company lost money in 1998, 1999, 2000, and 2001. Bill also presented the testimony of Ronald Greisen, who was qualified as an expert, to explain to the court issues of federal taxation, accounting, and business valuation.

■ Carey now claims that it was error for the superior court to rely on the $116 share price in its findings because the Leung Report should be considered inadmissible hearsay. But no objection on this basis was raised at trial. And even if hearsay, the report could be used as a basis for expert opinion.[51] Moreover, the superior court did

---

45. Turner, Equitable Distribution of Property (2d ed. 1994) Supp.2004 § 5.21, at 332. The opposite is also true, since if the separate property's value at the end of the marriage is greater than at the beginning, then there is marital interest to divide even if the property had lost value at times during the marriage. Turner, Equitable Distribution of Property (3d ed.2005) § 5.56, at 559 & 561 n. 20.

46. 883 P.2d 397, 401 (Alaska 1994).

47. *Id.*

48. We have previously held, generally, that the date of valuation for property in a divorce proceeding should be as close as practicable to the time of trial. *Ogard v. Ogard*, 808 P.2d 815, 819 (Alaska 1991). In *Ogard*, the former husband appealed the date of valuation of the property because if the date of separation were chosen, then he would have to cash out his former wife at a greater amount due to changes in the real estate market. We agreed with the husband to the detriment of the wife. *Id.* at 819. This

general presumption can be overcome and the superior court can decide which appraisal provides the most reliable information. *See id.* at 820; *Berg v. Berg*, 983 P.2d 1244, 1247–48 (Alaska 1999). In this case, an appraisal performed near the date of separation was accepted for valuation purposes. Carey did not object to that date during trial nor has she on appeal argued for the use of a different date.

49. Bill and Carey were married in June 1990.

50. This valuation was completed by the Odom Company's independent advisor in March 2002 and was considered sufficiently close to the date Bill and Carey separated (May 2002).

51. Alaska Rule of Evidence 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. Facts or data need not be admissible in evidence, but

not itself use that number but merely referred to it when describing the process by which Bill's expert valued the company. Carey also argues that she disputed the price of $116 by showing that the book value of the shares was listed as $158 per share. But she did not call a witness to explain why book value should indicate fair market value. Instead, Bill's expert "repeatedly explained that the accounting entry of historical book value had nothing to do with the fair market value of [Bill's] minority and unmarketable shares of the Company." Carey offered no other evidence as to the connection between book value and fair market value to contradict Bill's expert. Therefore, the superior court had "no evidentiary basis for selecting the method which [the expert] had rejected." [52]

In the alternative, Carey argues that certain facts that were before the superior court are in themselves prima facie indicators of an increase in value. She points particularly to the increase in Bill's income during the marriage and the increase in the Odom Company's gross revenues.[53] But the cases relied upon by Carey do not support her contention that these facts, standing alone, are sufficient to require a finding of appreciation in value.[54]

For example, in *Harrower v. Harrower*, it was only because neither party presented any evidence of asset value that we concluded it was reasonable to infer that stock would appreciate over a period of thirty years.[55] But in this case, evidence of the value of

Bill's interests in the Odom Company was squarely before the court and both of Bill's experts were qualified as experts by the superior court. And in *Schmitz v. Schmitz*, we used the fact that the revenue of the separate business increased during the period of marriage to infer that "the value of the business may have increased during the marriage," [56] but we did so because the financially disadvantaged spouse claimed that she was financially unable to hire an expert due to inequitable conduct on the part of her former husband and, moreover, because she had alerted the superior court to her predicament prior to trial.[57] In this case, in contrast, there is no evidence that Bill obstructed Carey's attempts to value the Odom Company. Bill provided Carey with documents pertaining to the company's finances as well as a summary of asset values. But she did not ask for a continuance to develop a valuation of the Odom Company. Although Carey argues now that she did not have the financial wherewithal to present evidence of asset values, there is no evidence in the record that Carey requested extra attorney's fees to pay for an independent valuation of the company or other assets owned by Bill.[58] Instead, there is evidence that Bill paid for Carey's attorney's fees.

In sum, it was Carey's responsibility to bring forth evidence to show that Bill was wilfully obstructing her access to company documents or to request aid in the event that

must be of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.

**52.** *Hayes*, 756 P.2d at 299.

**53.** Carey also points to various economic indicia such as the prices at which other insider interests had been bought out; a "price-to-revenue" comparison with the recent purchase of another company by the Odom Company; and the increase in property values held by the related partnerships. But it was her responsibility to provide expert testimony to show a link between these indicia and an appreciation in value in the Odom Company during trial. The superior court indicated that Carey provided no competent evidence as to the fair market value of Bill's interests.

**54.** Carey also argues that the perquisites drawn from the Odom Company show that the company

had increased in value. But the superior court found that the amount of perquisites had not increased during the marriage.

**55.** 71 P.3d at 859–60.

**56.** 88 P.3d at 1126.

**57.** *Id.* at 1126–27 ("Where a party's inequitable conduct hampers an opposing party's ability to develop potentially important evidence, a court on appeal is justified in remanding for development of appropriate evidence.").

**58.** Carey complains that the superior court should have ordered a fact-finding hearing. But the superior court explicitly found that there was enough evidence before it to value Bill's interests, noting that "[p]laintiff's failure to offer evidence on this issue does not mean that there is insufficient evidence before the Court."

the cost of an appraiser was too heavy for her to bear. But the superior court found that Carey "upon whom the burden of proof fell, offered no competent evidence as to the fair market value" of Bill's interests in the company. We have held that "it is the duty of the parties, not the court, to ensure that all necessary evidence is presented at trial" in divorce proceedings and that a party who fails to present sufficient evidence may not later challenge the adequacy of the evidence on appeal.[59]

### ii. The related partnerships

■ We now turn to a discussion of Bill's interests in the related partnerships. The superior court found that the doctrine of active appreciation did not apply to the partnerships for two reasons: (1) because the partnerships had not actively appreciated in value and (2) because neither Bill nor Carey made marital contributions to the property. No evidence of the partnerships' value was presented before the court by either party. The superior court found that "while the evidence is not sufficient for the Court to determine if these assets have appreciated, the evidence is quite clear that if there were such appreciation it would be passive, rather than active." In short, rather than requiring that the assets be separately appraised, the superior court relied on Bill's expert's view that any appreciation in value was passive.

We have remanded for further findings when an asset's value was not first determined. For example, in *Foster v. Foster*, we stated that it was error for the superior court not to value the allotment of native land that was the wife's separate property because that valuation should be taken into account when assessing the relative economic positions of the parties.[60] But in *Foster*, no evidence of the property's value was before the court, and it was in the light of that paucity of information that we determined it was clear error for the superior court to decide that the property value was negligible.[61] In this case, although the superior court did not have evidence of the actual value of either partnership before it, it did have testimony to the effect that if there had been an increase in the value of the partnerships, it "quite clear[ly]" would have been entirely passive in form. On appeal, Carey now asserts that the evidence of appreciation "cannot be reasonably disputed," but every example she offers is an example of passive appreciation rather than active appreciation.[62] As previously noted, Carey had the burden of proof on this issue, yet she failed to offer her own experts at trial or attempt to appraise the separate assets of the partnerships.[63]

Furthermore, the second finding made by the superior court, that no marital contributions were made to the partnerships, is sufficient on its own to counter the active appreciation argument.[64] The superior court found

---

59. *Brandal v. Shangin*, 36 P.3d 1188, 1193 (Alaska 2001). In addition, Alaska Civil Rule 90.1(e)(3) and (4) requires both parties to file with the court information concerning the value of each asset and liability and the proposed disposition, if any, of each asset or liability.

60. 883 P.2d at 401–02.

61. *Id.* at 402. Moreover, the assumption that the spouse actually owned and would be entitled to sell the property was in doubt due to an administrative appeal mounted by the state. *Id.*

62. For example, Carey tries to use Dr. Parks's example of his own home, which has appreciated in value over the thirty years he had owned it, but Dr. Parks was using that example to show the effects of market appreciation, a form of passive appreciation. She also attempts to use Greisen's "concession" that Bill's interests had

gained in value, but Greisen was once again explaining the concept of market appreciation. Furthermore, Carey neglects to acknowledge Greisen's balancing of rents and other inputs which would increase the value of the assets with the depreciation of the buildings and other forces that would decrease the value of the assets.

63. Carey cites with approval the fact that Bill's expert acknowledged that the partnership assets could be easily appraised. But her point, that Bill should have had the separate partnerships appraised, works against her own position, since she also could have had the assets appraised.

64. *See, e.g.,* TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 5.57, at 582 (3d ed. 2005) ("The most important factor in determining whether a given person contributed to the value of a particular asset is control. A person who had no control over the value of an asset was not in a position to contribute to it.").

that the partnerships were not a result of Bill's plans or ideas and that he did not work on them as part of the business. The partnerships are run instead by Odom Enterprises's managers as part of the company assets. Although it was her burden, Carey did not offer any evidence at trial that Bill managed or ran the partnerships during the marriage.

In sum, Carey failed to meet her burden of showing that there had been an increase in value of either Odom Company or the partnership or that any appreciation would have been active. Thus, the superior court did not err in its determination that Odom Company and the partnership were Bill's separate property.

### D. The Equitable Division of the Marital Estate and Invasion of Bill's Separate Property

■ Bill challenges the division of the marital estate and the invasion of his separate property. Both Bill and Carey appeal the amount by which the superior court invaded Bill's separate property as being arbitrary. Bill additionally argues that the lump sum form of the required payment of $2.25 million imposed upon him an impermissible

hardship. We agree that it was error to invade the separate estate without first determining whether an unequal division of the marital estate would properly balance the equities between Bill and Carey. We therefore remand for a re-examination of the division of the marital estate.

■ The division of marital property in a divorce is a matter of discretion for the trial court.[65] But in exercising that discretion, the trial court should follow "a process incorporating a number of statutory and common law principles."[66] Since *Wanberg v. Wanberg*, we have articulated this process as a matter of three steps: "First, the trial court must determine what specific property is available for distribution. Second, the court must find the value of this property. Third, it must decide how an allocation can be made most equitably."[67] Again since *Wanberg*, we have consistently noted that "the trial court generally should begin with the presumption that an equal division of marital property is most equitable."[68] We have also noted that this presumption can be overcome by a consideration of the *Merrill* factors[69] as codified and expanded in AS 25.24.160(a)(4).[70]

65. *Chotiner*, 829 P.2d at 831.

66. *Id.*

67. *Wanberg v. Wanberg*, 664 P.2d 568, 570 (Alaska 1983).

68. *Fortson v. Fortson*, 131 P.3d 451, 456 (Alaska 2006) (quoting *Brown v. Brown*, 947 P.2d 307, 313 (Alaska 1997)); *see also Wanberg*, 664 P.2d at 574–75.

69. *Merrill v. Merrill*, 368 P.2d 546, 547–48 n. 4 (Alaska 1962). *See, e.g., Tybus v. Holland*, 989 P.2d 1281, 1286 (Alaska 1999) (using the *Merrill* factors to decide whether an unequal distribution of the marital estate is just).

70. AS 25.24.160(a)(4) states in pertinent part:

(a) In a judgment in an action for divorce . . . the court may provide
. . . .
(4) for the division between the parties of their property, including retirement benefits, whether joint or separate, acquired only during marriage, in a just manner and without regard to which of the parties is in fault; however, the court, in making the division, may invade the property, including retirement benefits, of either spouse acquired before marriage when the balancing of the equities between the parties requires it; and to accomplish this end the judgment may require that one or both of the parties assign, deliver, or convey any of their real or personal property, including retirement benefits, to the other party; the division of property must fairly allocate the economic effect of divorce by being based on consideration of the following factors:
(A) the length of the marriage and station in life of the parties during the marriage;
(B) the age and health of the parties;
(C) the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage;
(D) the financial condition of the parties, including the availability and cost of health insurance;
(E) the conduct of the parties, including whether there has been unreasonable depletion of marital assets;
(F) the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physical custody of children;
(G) the circumstances and necessities of each party;
(H) the time and manner of acquisition of the property in question; and

But if either spouse owns separate property, then, as we noted in *Chotiner*,

> the division of property actually involves more than three steps. The court must determine what marital property is available for distribution, value that property, and make an equitable division if possible. If an equitable division is not possible, the court turns to the parties' separate property.[71]

It is clear from this language in *Chotiner* that the decision to invade separate property may be undertaken only after the trial court has attempted to use the marital estate to balance the equities between the parties in light of the parties' reasonable needs. It is only if that attempt has failed that the trial court should turn to the separate estate and proceed to "adjust the initial distribution as needed."[72]

In this case, the superior court invaded Bill's separate property before effecting an uneven division of the marital estate, including assets and debts, in light of Carey's reasonable needs. Indeed, the marital estate was divided in a manner that benefitted Bill, rather than Carey.[73] Rather than dividing the marital estate unequally in an initial attempt to balance the equities, the superior court turned to Bill's separate property.[74] It was error to invade the separate estate without first considering other equitable methods

of distributing the marital estate in light of the parties' reasonable needs.

The superior court found, in light of the *Merrill* factors, that the value of the marital estate was relatively small; that Carey had been long absent from the workforce; and that Carey lacked both retirement funds and other financial resources. The superior court particularly found Carey to be unable to generate "an income level that even remotely resembles the manner of lifestyle [to] which she and the children have been accustomed."[75] As a whole, these factors suggest that a large deviation from the equal division of the marital estate is justified.

But in some cases, even a large deviation from the equal division of the marital estate will not be sufficient to "fairly allocate the economic effect of divorce."[76] The legislature has recognized that invasion of separate property may be necessary and has provided that "the court, in making the [property] division, *may invade the property, including retirement benefits, of either spouse acquired before marriage* when the balancing of the equities between the parties requires it."[77] In *Sampson v. Sampson,* we determined that the *Merrill* factors[78] applied to the decision whether to invade separate property.[79] In *Sampson,* we explained that courts "should particularly consider factors such as the duration of the marriage, the conduct of the parties during the marriage,

---

(I) the income-producing capacity of the property and the value of the property at the time of division.

**71.** 829 P.2d at 831.

**72.** *Id.*

**73.** Bill's share of the marital estate came to $482,650 while Carey's share came to approximately $425,000.

**74.** This error is similar to that in *Brown v. Brown,* 947 P.2d 307 (Alaska 1997). In *Brown,* the case was remanded because "an examination of the superior court opinion on remand indicates that the trial court clearly failed to begin with the presumption that an equal division of *marital* property is the most equitable. Instead, the trial court appears to have begun with the presumption that an equal division of the marital property *and of Wendy's separate property* would be the most equitable." *Id.* at 313–14.

**75.** We have previously noted that "[w]hen a couple has sufficient assets, the spouse with the smaller earning capacity can and should receive a larger share in the property distribution." *Dodson v. Dodson,* 955 P.2d 902, 914 n. 19 (Alaska 1998) (alteration in original); *see also Berry v. Berry,* 978 P.2d 93, 96 (Alaska 1999) (noting that "[a]n unequal division may be upheld 'when it is justified by relevant factors identified in the findings of the court'" (quoting *Hayes,* 756 P.2d at 300)).

**76.** AS 25.24.160(a)(4).

**77.** AS 25.24.160(a)(4) (emphasis added); *see also Carlson v. Carlson,* 722 P.2d 222, 223–24 (Alaska 1986) (construing this statute).

**78.** *Merrill,* 368 P.2d at 547–48 n. 4.

**79.** *Sampson v. Sampson,* 14 P.3d 272, 277–78 (Alaska 2000).

the manner of acquisition of the property, its value at the time of acquisition and at the time of the property division, and any other factors bearing on whether the equities dictate that the other spouse is entitled to share in that property." [80]

 In this case, the superior court relied on its finding that the parties "lived an opulent and wealthy lifestyle" and that Bill "will continue to have access to such luxuries and wealth from the Odom Corporation after the divorce" while Carey "will no longer be the beneficiary of these privileges." But in Alaska it is not expected that a former "extravagant" lifestyle will be supported.[81] The proper test to be applied by the trial court is the reasonable needs of the parties.[82] The result of the property division must not lead to a widely disparate lifestyle between spouses, particularly when children are involved. The trial court's goal should be to provide Carey with a comfortable and financially secure lifestyle, where her activities and the children's hobbies are able to continue and the children live in comparable surroundings when with either parent.

Carey did provide evidence of her reasonable needs. In the trial court, Carey submitted two projected monthly budgets ranging from $11,550 to $12,489. The superior court presumably considered these projections when it awarded Carey $8,000 a month in interim support pending the ordered lump sum payment of $2.25 million by Bill. After weighing the conflicting evidence concerning Carey's reasonable financial needs, the superior court certainly could have found that the equities demanded that 100% of the marital assets be allocated to Carey and 100% of the debt to Bill.[83] Indeed, in her proposed findings in the trial court, Carey urged the court to award her such marital assets as the Anchorage and Girdwood residences free of debt as a first step toward equitable division. As she remarks in her brief to this court, "[t]his would have given [Carey] ... saleable and appreciating assets that could provide reasonable financial security and something approaching the lifestyle that the family enjoyed during marriage."[84]

And if, after such an unequal division of marital property, the trial court were to find that Carey's reasonable needs would still go unmet, then long-term spousal support might be warranted.[85] In Alaska, awards of spousal support are permitted under AS 25.24.160(a)(2) if they are determined to be "just and necessary." The legislature provided a number of factors[86] to

80. *Id.* at 278 (quoting *Vanover v. Vanover*, 496 P.2d 644, 648 (Alaska 1972)).

81. *Beal*, 88 P.3d at 112.

82. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 8.16, at 867 (3d ed.2005).

83. *Cf. Tybus*, 989 P.2d at 1286 (affirming an award of all of the marital debt to the spouse with the higher earning power).

84. Carey continued to maintain that "[s]ome division of Bill's claimed separate property would still be necessary; but, as Carey proposed, the amount awarded from those interests would have been substantially offset in a final reconciliation by the fair market value of the two homes."

85. *See, e.g., Hammer v. Hammer*, 991 P.2d 195, 199 (Alaska 1999) (affirming award of permanent spousal support as just and necessary due to spouse's lack of work experience, responsibility as child's custodial parent, her deafness, lack of job prospects, and limited ability to retrain for employment).

86. AS 25.24.160(a)(2) provides:

(a) In a judgment in an action for divorce ... the court may provide

....

(2) for the recovery by one party from the other of an amount of money for maintenance, for a limited or indefinite period of time, in gross or in installments, as may be just and necessary without regard to which of the parties is in fault; an award of maintenance must fairly allocate the economic effect of divorce by being based on a consideration of the following factors:

(A) the length of the marriage and station in life of the parties during the marriage;

(B) the age and health of the parties;

(C) the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage;

(D) the financial condition of the parties, including the availability and cost of health insurance;

(E) the conduct of the parties, including whether there has been unreasonable depletion of marital assets;

(F) the division of property under (4) of this subsection; and

help determine the amount and form of spousal support. For example, in *Broadribb v. Broadribb*, we affirmed the superior court's finding that

> the available property in this case was insufficient to compensate Sandra adequately or to provide adequately for her reasonable future living expenses.... Given Sandra's age and limited earning capacity, the court concluded that "it is questionable whether she will accrue any substantial employer-provided pension in her remaining work years," and that she will therefore need to invest a significant sum to provide for her future needs. Against the backdrop of these findings, the court awarded Sandra spousal maintenance in the amount of $3,000 per month for three years, and $2,000 per month for two additional years. Based on its extensive findings regarding Michael's financial status, the court concluded that he would be able to pay this amount of maintenance.[87]

And Bill's financial status, including his separate property, can be taken into account when awarding spousal support.[88]

Initial consideration of the unequal division of the marital estate and spousal support may have rendered unnecessary the invasion of Bill's separate property and avoided the practical problems entailed in such a large lump sum payment, as well as the issue of the excessive size of the invasion.[89] In this case, the invasion of the separate property in the sum of $2.25 million was an abuse of discretion. Thus, we vacate the division of the marital estate and the lump sum award of $2.25 million and remand for reconsideration of the property division so that the trial court may examine an unequal division of marital property, with an award of most or all assets to Carey and the debt to Bill, along with the possibility of spousal support as the preferred method of meeting Carey's reasonable needs in this case.[90]

## V. CONCLUSION

The custody order and award of the Anchorage home are AFFIRMED. The finding that Bill's interests in Odom Enterprises are separate property is AFFIRMED. Because the superior court did not first attempt to balance the equities by unequally dividing the marital estate, awarding property to Carey and debt to Bill, its property division and invasion of separate property in the amount of $2.25 million are VACATED and we REMAND for further proceedings consistent with this opinion.

EASTAUGH, Justice, not participating.

---

(G) other factors the court determines to be relevant in each individual case.

87. 956 P.2d 1222, 1226 (Alaska 1998).

88. AS 25.24.160(a)(2)(D); *see, e.g.,* Turner, Equitable Distribution of Property § 8.33, at 941 (3d ed.2005) (noting that a spouse's separate property can be taken into account when awarding alimony).

89. Both Bill and Carey challenged the $2.25 million amount. Bill additionally challenged the lump sum form of the award as imposing an impermissible hardship on him.

90. We do not mean to imply that when an unequal division of the marital estate is determined to be insufficient to meet a spouse's reasonable needs, spousal support is to be preferred to the invasion of separate property in every case. The facts of each case will determine whether an invasion of separate property or spousal support is warranted. In this case, spousal support is preferable to invasion of separate property because of the illiquid nature of Bill's interests combined with the likelihood that they will continue to yield considerable cash flow.